## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **THE CROSSROADS GROUP, LLC, et al.,** | : | **Case No.  23-cv-184** |
| | : | |
| **Plaintiffs,** | : | **Judge Calabrese** |
| | : | |
| **-vs-** | : | |
| | : | |
| **CITY OF CLEVELAND HEIGHTS, OHIO, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

---

### PLAINTIFF-CLASS MEMBERS MOTION FOR SUMMARY JUDGMENT

---

Maurice A. Thompson (0078548)
1851 Center for Constitutional Law
122 E. Main Street
Columbus, Ohio 43215
Tel:  (614) 340-9817
*MThompson@OhioConstitution.org*

Michael R. Rasor (0086481)
Cavitch, Familo & Durkin
1300 East Ninth Street – 20th Floor
Cleveland, OH 44114
Tel:  (216) 472-4650
*MRasor@Cavitch.com*

*Attorneys for Plaintiff-Class Members*

1

## TABLE OF CONTENTS

BACKGROUND………...………………......………………………...………..……….......................3

LAW AND ANALYSIS ……………..………...…………………………………………..................7

    A.    The Fee is an Unconstitutional Condition…………………………………………………..8

        i.    There must be "rough proportionality" between The Fee and the impact of leasing residential homes while residing beyond Cuyahoga County………………………….9

        ii.    There is no "rough proportionality" between the "Out of County Owner Registration Fee" and the impact of leasing a residential home while residing beyond the boundaries of Cuyahoga County………………………………………………..17

    B.    Plaintiffs are entitled to prevail on the merits of their retrospective and prospective Fourteenth Amendment claims………………………………………………………………24

        i.    The Fee is subject to heightened Equal Protection scrutiny………………………24

        ii.    The Fee is subject to heightened Privileges and Immunities Clause scrutiny………26

        iii.    The Fee is subject to heightened scrutiny by virtue of the Ohio Constitutions due process and property rights protections…………………………………………...29

        iv.    Discrimination against nonresidents through imposing a duplicative Fee solely upon them, to fund exclusively public ends, is impermissibly arbitrary and fails any scrutiny…………………………………………………………………………30

            a.    There is no permissible justification for imposing The Fee……………………..31

            b.    There is no legitimate governmental basis, pursuant to *any* degree of scrutiny for imposing a *repealed* fee on non-residents……………………………………….33

            c.    *Post Hoc* reliance on Section 1369.16 does not justify imposing The Fee during the repeal of Section 1351.34(c)…………………………………………….34

CONCLUSION……………….……………………………………….......................................37

CERTIFICATE OF SERVICE…………………..………...……..…………………......................38

The City of Cleveland Heights impermissibly imposes, at the threat of criminal penalty and revocation of one's Certificate of Occupancy, annual financial penalties on homeowners who simply lease their homes while residing beyond the borders of Cuyahoga County.  The City then spends the hundreds of thousands it collects on everything from employee holiday parties and parks to police, fire, and roads.

This residency-based exaction, administratively-created for the majority of this litigation, discriminatorily and arbitrarily utilizes homeowners' *county of residence* alone as a surrogate for *harm* to or *impact* on the City.  In imposing it, the City exceeds the outer limits of the Fifth and Fourteenth Amendments guarantees pursuant to the Unconstitutional Conditions Doctrine, the Equal Protection and/or Privileges and Immunities Clause, the Due Process Clause, and the more protective state analogs to these guarantees.

Accordingly, this Court should permanently enjoin the City of Cleveland Heights from initiating criminal prosecution, imposing fines or other penalties on Class Members, or revoking Class Members' Certificates of Occupancy in response to their continued exercise of the longstanding right to lease their homes to others while (1) residing beyond Cuyahoga County; (2) refusing to uniquely and anomalously fund the City's purely public functions merely due to their status.  In addition, Class Members are entitled to restoration of funds seized from them from *no later than* January 31, 2021 through the present.

## I.  Background

To lease a home in the City of Cleveland Heights, *any* homeowner, regardless of the location of his or her residence, is required to register and apply for a certificate of occupancy.  Doc. 5-2, PageID 83.  But homeowners who dwell somewhere other than Cuyahoga County must do so *twice,* and *pay* twice.  This Court has referred to this second, redundant payment, as a "$100 annual out-of-county owner registration fee."  Doc. 32, PageID 783-784, 803 (hereinafter "The Fee").

Named Plaintiffs own numerous homes within the City of Cleveland Heights – primarily single-family homes – and declined to remit this "Outsiders Penalty" to the City when it was due.  In response, the City indicated to Plaintiffs on January 4, 2022, that failure to pay The Fee subjected them to (1) inability to acquire the requisite permit to lease their homes; (2) loss of that permit; and (3) prosecution for a first-degree

misdemeanor."  Doc. 1-3, PageID 41.  Under threat of criminal prosecution, Plaintiffs paid the Outsiders Penalty in 2022.

### A.    *Avowed governmental interest underlying The Fee*

Through Law Director Pamela Roessner, the City identified the City's two governmental interests in imposing The Fee on nonresident owners of leased residential homes as follows:  "The first, which is why they decided to require an out-of-county owner to designate an in-county agent, is to have a local agent available to accept service of process when there are legal filings such a[s] court commons, subpoenas, nuisance abatement actions, or just generally to have a local contact in case of an emergency arising at the property" and "[t]he second reasoning was that there is an increased amount of resources expended by the City on properties owned by out-of-county owners, such as inspections and monitoring, in addition to handling the paperwork for the registration, and hence the fee."  Doc. 1-3, PageID 41.

City Housing Programs Director Allan Butler[1] later articulated the City's governmental interest in imposing The Fee as follows: "there was a need to have a local agent assigned to anybody who resides outside of Cuyahoga County.  So through their, you know, information and concerns, they creates this ordinance."  Doc. 24-1, PageID 459.  He added "there are challenges with reaching out to different owners, if they reside in remote locations."  Doc. 24-1, PageID 459.  However, when questioned on whether these issues actually exist, and asked to provide any examples," Mr. Butler responded, "I just can think of any specifically."  *Id.*

But on January 14, 2022, Plaintiffs submitted to the City a public records request seeking details "as to (a) all payments made to the City for the $100 out-of-county ownership registration, (b) the names and addresses of all such individuals who have made these payments since January 1, 2019, (c) the total amount of these fees collected for calendar years 2019, 2020, and 2021, (d) what bank account or funds these fees were transferred into, and (e) how these fees were applied from an expenditure standpoint."  *Doc. 1-3,*

---

[1]     The City promotes its Housing Programs Director Allan Butler as the individual with the greatest knowledge regarding The Fee.  Doc. 24-1, PageID 456.

*PageID 39.*  The City was unable to provide records or other evidence substantiating that homes owned by those residing outside of Cuyahoga County impose more costs on the City or receive more governmental benefits from the City; and unable to provide records or other evidence substantiating how funds derived assessment of the Outsiders Penalty have been or are being used by the City.  *Doc. 1-3, PageID 36, 39-40.*

The City further indicated that it transfers revenue from The Fee to the City's general fund, and that the City does not track how these funds are spent, once transferred into the general fund.  *Doc. 1-3, PageID 36.* (More specifically, the City's position is that "[t]here are no records responsive to your request regarding how those fees are used because they are combined in the general fund" and "[t]he fees are deposited into the general fund of the City of Cleveland Heights.  The ordinance requiring the registration of dwelling structures by out-of-county owners (CHCO Section 1351.34) does not require the City to maintain an itemized list of what the fees are being spent on, and therefore such a list does not exist").  As will be discussed below, subsequent discovery has only served to cast the same doubt on The Fee.

### B. Redundancy

*Everyone* who leases a residential dwelling in Cuyahoga County is subject to the requirements of Cleveland Heights Municipal Code Section 1347.02, which requires that "No owner, agent, or person in charge of any dwelling structure used or intended to be used as a single-family [or multiple dwelling house or structure], shall rent or lease such structure for residential occupancy unless the owner thereof holds a certificate of occupancy . . . for such structure."  Doc. 43-2, PageID 889.[2]  This is essentially an annual residential rental registration permit requirement by another name.  All homeowners obtain this rental registration permit, or "certificate of occupancy," by "annually supplying necessary information . . . such information shall include . . . the name, address, telephone number, and email address of the agent or person in charge of the property."  Doc. 43-2, PageID 890.  Also to be provided, if different, is, "if the owner does not reside on the premises, the name, address, telephone number, and email address of the resident agent in

---

[2]     The City altered this municipal code section, in response to this litigation, through ordinance 98-2023, on June 20, 2023.  *Id.*

5

charge of the building or structure," as well "the nonresident agent," if any.  *Id.,* at 1347.03(b)(2).  To "apply" for the right to lease one's Cleveland Heights home, that homeowner must also provide the City with a payment of "$200 for the first dwelling unit in a building, plus $50 for the second dwelling unit in the building . . . nonrefundable.  Doc. 43-2, PageID 892, at 1347.06(a).

Grafted on top of this complete regulatory scheme is The Fee, an additional penalty on those residing beyond the boundaries of Cuyahoga County.  Upon inquiry, the City is unable to identify a reason why The Fee is levied putatively in relation to designation of a local agent, when Section 1347 already requires and charges for designation of a local agent for all purposes.  Doc. 45-1, PageID 1035.

C.      **The Repeal**

The Section governing "Registration of Dwelling Structure[s] by Out-of-County Owners" once imposes a $100 per year penalty on nonresident owners of leased residential homes that the City initiated through Ordinance 170-2012 in 2012 and repealed through Ordinance 124-2020 in 2020.  See Doc. 5-1, PageID 80, Doc. 1-2.  After Named Plaintiffs brought this repeal to the attention of city attorneys and enforcement officials, in response to their efforts to collect the Section 1351.34(c) Fee, those officials then informed Named Plaintiffs that the City would be attempted to collect the funds nevertheless, through a different municipal code section governing business structures.  See Doc. 1-3, PageID 41-46 ("Notice of Violation and Ensuing Correspondence").  In recognition of the futility of this effort to plug the leak, the City, after this litigation began, on June 23, 2023, reenacted the repealed Section 1351.34(c) Fee, again at $100 per year, per property.   Doc. 43-1, PageID 886; 43-4, PageID 939; 43-7, PageID 980.

Consequently, The Fee was not in effect during the entire period of Class Members payments:  here Plaintiffs' Class consists of "All individuals and businesses who own residential rental property in the City of Cleveland Heights and, while residing outside of Cuyahoga County, on or after January 31, 2021, paid to

6

the City of Cleveland Heights one or more $100 annual out-of-county owner registration fees."[3]  Since this date, the City has indicated that it collected at least $388,650 from Class Members.  Doc. 45-1, PageID 1033.

### D.    Plaintiffs' Class

On April 11, 2024, this Court observed certified the following class: "*All individuals and businesses who own residential rental property in the City of Cleveland Heights and, while residing outside of Cuyahoga County, on or after January 31, 2021, paid to the City of Cleveland Heights one or more $100 annual out-of-county owner registration fees.*"  Doc. 32, PageID 803.  Subsequent thereto, Plaintiffs identified 1,344 Class Members, and provided each, through contact information provided by the City, with notice of this class action and an opportunity to opt out.  Plaintiffs received no "opt out" forms.

## II.   Law and Analysis

When considering cross-motions for summary judgment, a district court should consider "each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard." Id. (quoting *Monumental Paving & Excavating, Inc. v. Pa. Mfrs. Ass'n Ins. Co*., 176 F.3d 794, 797 (4th Cir. 1999)).With respect to summary judgment the record 'shows there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' " *Adamson v. Columbia Gas Transmission, LLC*, 987 F. Supp. 2d 700, 703 (E.D. Va. 2013) (quoting *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010)).

Here, the ensuing analysis displays that no governmental interest justifies burdening Class Members' constitutional rights through imposition of the discriminatory Section 1351.34(c) Fee.  Accordingly, the foregoing standards weigh strongly in favor of the Plaintiffs and the granting of the present motion, as Plaintiffs are entitled to prevail, as a matter of law, on each of their claims -- any one of which is dispositive.

---

[3]    The City has indicated that it suspended collection of The Fee sometime in 2023.  The record remains unclear.

A.  **The Fee is an Unconstitutional Condition.**

"The unconstitutional-conditions doctrine restricts the government's ability to deny a valuable government benefit to a person on a basis that infringes his constitutionally protected interests . . . This would allow the government to 'produce a result which [it] could not command directly," and "[s]uch interference with constitutional rights is impermissible."  *Daunt v. Benson,* 999 F.3d 299, 316 (6th Cir. 2021), citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Speiser v. Randall*, 357 U.S. 513, 526 (1958).

Recognizing this imbalance of power between permit applicants and the government, as well as the resulting risks posed to applicants' constitutional rights, the Supreme Court determined in *Nollan*, 483 U.S. at 837, and *Dolan*, 512 U.S. at 391, that while the government *may* condition land-use permit approvals *to mitigate impacts* of use, it *may not* leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts.  *Koontz v. St. Johns River Water Mgmt. Dist.,* 570 U.S. at 604.

As such, *Nollan* and *Dolan* "involve a special application of [the unconstitutional conditions] doctrine that governs when owners apply for land-use permits . . . When a city conditions receipt of a permit on the payment of a monetary exaction, *the burden [is] on the city to justify the required dedication*."  *Koontz,* at 604, citing *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994) and *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 837 (1987).  And whether a city meets this burden is subject to "*exacting scrutiny*," rather than anything remotely akin to rational basis review.  *Id.*

This higher level of scrutiny is warranted, the Court explains, because land-use permit applicants may be vulnerable to such "coercion ... because the government often has broad discretion to deny a permit that is worth far more than property it would like to take." *Koontz,* 570 U.S. at 605, 133 S.Ct. 2586. Under such circumstances, applicants may be unduly pressured to exchange constitutional rights for sought-after permit approval.  *Id.* (Courts must carefully police "the special vulnerability of land use permit applicants to extortionate demands for money").

8

i. **There must be "rough proportionality" between The Fee and the impact of leasing residential homes while residing beyond Cuyahoga County.**

The conditions for applying the heightened "rough proportionality" test articulated in *Nollan, Koontz, Sheetz, Knight, FP Development,* and *Beavercreek* are met here.

a. ***Koontz and Beavercreek confirm that the City must demonstrate "rough proportionality."***

*Koontz*, *Sheetz*, *Knight*, and *FP Development* all explicitly rely upon the Ohio Supreme Court's now-24-year-old analysis in *Beavercreek*.  The facts, circumstances, and holdings there reject each of the City's predicates here for why it believes exacting scrutiny ought not apply.

*First*, the United States Supreme Court relied on *Beavercreek* in *Koontz* for the proposition that, "the government's demand for property from land-use permit applicants must satisfy the requirements of *Nollan* and *Dolan* . . . even when its demand is for money," and "[courts] treat[] confiscations of money as takings despite their functional similarity to a tax." *Koontz,* supra.  Indeed, a takings analysis applies even "where the government, by confiscating financial obligations, achieved a result that *could* have been obtained by imposing a tax." *Koontz,* supra*.,* at 615, 619; see also *Am. Furniture Warehouse Co. v. Town of Gilbert*, 245 Ariz. 156, 163 (Ct. App. 2018)("*Koontz* held that, when applicable, *Nollan/Dolan* provides the proper analysis when the government conditions issuance of a permit either upon the payment of a fee or upon the transfer of property"); *Koe-Krompecher v. City of Columbus*, 2005-Ohio-6504, ¶¶ 1-24 (exactions takings analysis applies to government "taking personal property, i.e., money, outright with no authority to do so").

The Supreme Court then explicitly cited *Beavercreek* for the very proposition the City continues to insist this Court must reject:  **"**Finally, we disagree with the dissent's forecast that our decision will work a revolution in land use law by depriving local governments of the ability to charge reasonable permitting fees. Numerous courts—including courts in many of our Nation's most populous States—have confronted constitutional challenges to monetary exactions over the last two decades and applied the standard from *Nollan* and *Dolan* or something like it. Yet the 'significant practical harm' the dissent predicts has not come

9

to pass." *Koontz,* at 629, citing *Home Builders Assn. v. Beavercreek,* 89 Ohio St.3d 121, 128, 729 N.E.2d 349, 356 (2000).

Notably, arguably the most exhaustive case to date on the subject, the North Carolina Supreme Court's 2022 decision in *Anderson Creek Partners*, also relies on *Beavercreek* for the same proposition. *Anderson Creek Partners, L.P. v. Cnty. of Harnett,* 2022-NCSC-93, 382 N.C. 1, 34, 876 S.E.2d 476, 500, reh'g denied, 878 S.E.2d 145 (N.C. 2022)("fact that the challenged '*capacity use' fees* are generally applicable and were enacted by a legislative body, rather than being assessed on an *ad hoc* basis by an administrative agency, does not exempt them from constitutional scrutiny").

*Second,* there was no requisite dedication of property or "fee in lieu of" such a dedication in *Beavercreek*: the home builders challenge was to, as here and without more, an "impact fee."  *Cook Rd. Invs.., L.L.C. v. Cuyahoga Cty. Bd. of Commrs.*, 2011-Ohio-2151, ¶ 13 ("In *Home Builders,* a homebuilders' association and developers challenged the constitutionality of the city of Beavercreek's *impact-fee ordinance* for funding roadway improvements for a new development").

*Third,* the Ohio Supreme Court's decision in *Beavercreek* affirms that the burden is on *the city attempting to impose a permit fee* when exacting scrutiny applies.  *Beavercreek*, at 125 ("The dual rational nexus test places the burden on the city of Beavercreek" to "demonstrate" that the fee imposes a permissible condition rather than an impermissible taking").  A city must meet this burden by *producing evidence*.  *Id*., at 130-131 ("a court should consider the actual costs of constructing new roadways, the formula used to determine the fee, the fee paid by a particular developer, the city's contribution, road improvements made directly by developers, the length of time between the payment of the fee," so "[t]he trial court reviewed volumes of evidence relating to the methodology and functioning of the Beavercreek ordinance").  In other words, courts apply rigorous scrutiny when a city attempts to justify such a "fee," "condition," or "exaction." *Id.*  ("local governments should be subject to a higher degree of scrutiny").

*Finally, Beavercreek,* as an unconstitutional conditions action, was not brought as a mandamus action, as the City claims is required here.  Nevertheless, the Court described its analysis as "evaluating the

10

constitutionality of an impact fee ordinance when a Takings Clause challenge is raised." *Id.* Consequently, *Koontz* and *Beavercreek*, and their repeated adoption in subsequent decisions that are binding or persuasive here, corroborate that exacting scrutiny – through strict proportionality analysis, applies to the City's Fee.

   **b.** ***Sheetz* confirms that the City must demonstrate "rough proportionality."**

On April 12, 2024, the Supreme Court held in favor of the property owner-plaintiff in *Sheetz v. Cnty. of El Dorado, California*, 144 S. Ct. 893 (2024). The majority and concurring opinions illuminate this Court's analysis of Plaintiffs' takings claim because the City has staked its defense to the position that its "Out of County Fee" is not subject to scrutiny pursuant to the Unconstitutional Conditions Doctrine. In support it claims the exaction is a "reasonable user fee," and "it would constitute a significant intrusion into the legislative function if the courts were to conduct judicial inquiry into legislatively-prescribed fees." *Doc. 15, PageID 205-206*. The City further yet claims that the Unconstitutional Conditions Doctrine cannot be applied to a "fee that may be charged" for "a land use permit application." *Doc. 15, PageID 208*. And finally, the City insists that the Unconstitutional Conditions Doctrine applies solely to exactions that can be described as "in lieu of fees," and "*Koontz* does not apply to an alleged 'exaction' that arises from a 'legislative' land use ordinance." *Doc. 15, PageID 209*. Through *Sheetz,* the Supreme Court either implicitly or explicitly rejects each of these predicates.

*First, Sheetz* reaffirms the reality that *Nollan, Dolan,* and *Koontz* scrutiny apply to *"fees"* levied as conditions of receiving land use permits pursuant to "general plans" enacted by the legislative branches of local governments when "assessed according to a rate schedule." *Sheetz,* supra., at 898 ("[a]s a condition of receiving a residential building permit, petitioner George Sheetz was required by the County of El Dorado to pay a $23,420 traffic impact fee . . . The fee amount was not based on the costs of traffic impacts specifically attributable to Sheetz's particular project, but rather was assessed according to a rate schedule that took into account the type of development and its location within the County"). Thus, "conditioning a permit on the payment of a fee," without more - - such as any requirement that the fee is "in lieu of a donation of land" subjects the condition to exacting scrutiny and rough proportionality analysis. See also *Knight v. Metro.*

*Gov't of Nashville & Davidson Cnty., Tennessee*, No. 21-6179, 2023 WL 3335869, at 8–10 (6th Cir. May 10, 2023)("There was nothing special about the requested fee in *Koontz* that drove the Court to apply that test"), citing with approval and relying upon cases applying the Unconstitutional Conditions Doctrine to permit conditions that extracted fees that were not "in lieu of fees" or dedications of physical real property. *Anderson Creek Partners, L.P. v. County of Harnett*, 382 N.C. 1, 876 S.E.2d 476, 496–503 (2022) and *Home Builders Ass'n of Dayton & the Miami Valley v. Beavercreek*, 89 Ohio St.3d 121 (2000).

*Second*, "the Takings Clause does not distinguish between legislative and administrative land-use permit conditions." *Id.* Accordingly, the Supreme Court rejected the lower court's reasoning that Nollan and Dolan are inapplicable to "a fee like this one imposed on a class of property owners by [] legislation." *Id.*, at 900, citing *Knight v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 67 F.4th 816, 818 (6th Cir. 2023)("We now hold that Nollan's unconstitutional-conditions test applies just as much to legislatively compelled permit conditions as it does to administratively imposed ones," and finding "*Nollan*'s test" applicable to "generally applicable legislative conditions that city councils impose on all permit applicants").

*Third*, the Supreme Court explained that special scrutiny is warranted when "government withholds or conditions [that] permit for reasons unrelated to its land use interests." *Sheetz,* supra., at 899-900. This threshold matter is satisfied here, since the City withholds rental permits from nonresidents who do not supplement the City's general fund by paying The Fee.

*Third*, the fact that the exaction here is not a forced payment in lieu of a forced donation of real property is of no consequence, with respect to whether the Unconstitutional Conditions Doctrine is applicable.

*Fourth*, the Supreme Court's holding cites with approval Unconstitutional Conditions Doctrine cases Plaintiffs have previously commended to this Court as applicable here. See *Knight v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee,* 67 F.4th 816, 819 (6th Cir. 2023); *Home Builders Ass'n of Dayton & the Miami Valley v. Beavercreek*, 89 Ohio St.3d 121 (2000).

In conclusion, *Sheetz* would appear to address each of the concerns Defendants articulate in attempting to dissuade this Court from undertaking nexus and proportionality analysis.[4]

### c. *Knight confirms that the City must demonstrate "rough proportionality."*

The Sixth Circuit's binding decision and underlying rationale in *Knight*, in points beyond those just referenced, further confirm that the unconstitutional condition doctrine's exacting scrutiny applies here. When discussing when it is applicable, the Sixth Circuit's describes the Unconstitutional Conditions Doctrine as the "test for permit conditions," the first step of which is the threshold inquiry of "whether the condition would qualify as a taking if the government had directly required it."  *Knight*, supra. ("we have once applied *Nollan* to an ordinance imposing conditions on landowners who sought permits to cut down trees.").  As such, within this Circuit, exacting scrutiny is "triggered" as follows:

> As its name suggests, this test gets triggered when the government imposes "a *condition* for the grant of a building permit[.]" And this case is about conditions on building permits. Unlike a land-use law that regulates all property owners (including those who do not seek permits), the sidewalk ordinance does not compel all owners to build a sidewalk or pay a fee. It reaches only those who seek permits.

*Knight*, supra., at 8 ("Perhaps Nashville could require this taking as a condition on a permit (even if it could not directly compel it), but *Nollan*'s nexus and rough-proportionality elements supply the tools for deciding whether it may do so").  Further, the Court explained that while the "ordinance's conditions extend to all permit applicants whose property falls within covered areas (not just a specific applicant), we do not read *Dolan* as making the parcel-specific nature of a condition important." *Knight*, supra., at 13–14.  Instead, the concern the unconstitutional condition doctrine's exacting scrutiny seeks to address is as follows:

> [T]he government might try to leverage its monopoly permit power to pay for unrelated public programs on the cheap.  If the expected value of an owner's proposed project exceeds the

---

[4]      Justice Gorsuch explained in his concurring opinion precisely why there is little doubt that "the *Nollan/Dolan* test" operates the same "when an alleged taking affects a "class of properties," as here, rather than solely to "a particular development," since "[n]othing about that test depends on whether the government imposes the challenged condition on a large class of properties or a single tract or something in between. Once more, how the government acts may vary, but the Constitution's standard for assessing those actions does not.  Our precedents confirm as much." *Sheetz,* supra., at 903-904 (Gorsuch, concurring).  Justice Gorsuch concludes "[i]n short, nothing in *Nollan*, *Dolan*, or today's decision supports distinguishing between government actions against the many and the few any more than it supports distinguishing between legislative and administrative actions. In all these settings, the same constitutional rules apply." *Id.,* at 904.

condition's expected costs, the owner has an incentive to give in to this "demand" <u>even when the demand has no connection to the project's harmful social effects</u>.  Yet this type of coercion falls near the core of the Takings Clause, which bars the government from forcing a few people to bear the full cost of public programs that "the public as a whole" should pay for.

*Knight*, supra., at 6, 15 (emphasis added).  The Court then emphasized the need to guard against invidious discrimination and protectionist undercurrents:  "A majority of local taxpayers may well "applaud" the lower taxes that their politically sensitive legislators can achieve through this type of cost shifting . . . In this case, for example, Nashville could have financed its sidewalk expansion through a generally applicable special assessment imposed on all property owners. It instead opted to rely on in-lieu fees charged only to those who sought to develop their property . . . But the Takings Clause (like the rest of the Bill of Rights) seeks to protect a minority from the popular will as much as from the bureaucratic one."

### d.  *FP Development and its progeny confirm that the City must demonstrate "rough proportionality."*

The Sixth Circuit's decision in *FP Development*, was itself a challenge to a fee described as both a "permitting fee" and an "impact fee," not a challenge to a forced contribution of land or money in lieu of land.  *F.P. Dev., LLC v. Charter Twp. of Canton, Michigan*, 16 F.4th 198, 207–08 (6th Cir. 2021)**(**"On the record before us, Canton's Tree Ordinance, as applied to F.P., fails rough proportionality and is thus an unconstitutional condition under *Nollan*, *Dolan*, and *Koontz*"**)**, relying on *Home Builders Ass'n of Dayton & the Miami Valley v. Beavercreek*, 89 Ohio St.3d 121, 729 N.E.2d 349, 357–59 (2000).

In a companion case, the Michigan Court of Appeals revisited "whether *Nollan* and *Dolan* are applicable in the first instance because the Tree Ordinance required no dedication of property."  *Charter Twp. of Canton v. 44650, Inc.,* No. 354309, 2023 WL 2938991, at p. 12 (Mich. Ct. App. Apr. 13, 2023).

The Court of Appeals first acknowledged **"**[o]ther jurisdictions have recognized that *Koontz* applies more broadly to government demands for money from a permit applicant as a condition of the permitting process."  *Id.,* citing *Anderson Creek Partners, L.P. v Harnett Co.*, 382 N.C. 1, 28, 876 S.E.2d 476 (2022) (holding that *Koontz* is not limited to "in lieu of" fees and instead "encompassed a broader range of

governmental demands for the payment of money as a precondition for the approval of a land-use permit").

In next provided clear analysis unmistakably rejecting the City's position here:

> Under the Tree Ordinance, defendant must either pay fees into the tree fund or replace the trees at its own expense. There is no dedication of real property demanded in exchange for the use permit, nor have any fees been demanded in lieu of such a dedication. *Koontz*, however, did not expressly limit its holding to the factual circumstances before the Court or otherwise hold that *Nollan* and *Dolan* apply to monetary exactions only so long as they are demanded as an alternative in lieu of a dedication. Instead, the Court's holding is fashioned in broader terms, stating that "the government's demand for property from a land-use permit applicant must satisfy the requirements of *Nollan* and *Dolan* even when ... its demand is for money . . . *Koontz* did not limit the applicability of the unconstitutional conditions doctrine to money demands in lieu of dedication.
>
>             \*\*\*
>
> First, the core concerns of the unconstitutional conditions doctrine are directly at play. This matter involves plaintiff's permitting process, wherein it has conditioned the issuance of a permit on either paying into the tree fund or replacing removed trees at defendant's cost. Consequently, plaintiff is positioned to potentially make extortionate demands through the permitting process that could frustrate the Fifth Amendment, while at the same time seeking to ensure that permit applicants, like defendant, bear the negative societal costs of their proposed development. *Koontz*, 570 U.S. at 604-605, 133 S.Ct. 2586

*Id.,* at 12-13, citing *Koontz*, 570 U.S. at 619, 133 S.Ct. 2586.  Thus "the tree cases," adjudicating forced payments associated with certain productive uses of property, confirm that exacting scrutiny applies here.

### e. *The foregoing conditions for applying exacting scrutiny are met here.*

Here, Class Members seek permits to lease their homes.  But before the permit may be granted, the City requires a parcel-specific contribution of $100-per-year-per-property to the City's general fund.  This condition does not apply to all landowners:  it only applies to those seeking permits to lease while residing beyond the boundaries of Cuyahoga County.  In addition to the power to deny these permit applications when The Fee is not paid, the City's Municipal Code Section further articulates the City's "power to revoke a certificate of occupancy . . . if the owner, agent, or person in charge of a structure refuses to comply with any applicable provisions of this Housing Code."  Doc. 5-2, PageID 83 (Section 1347.02(d)).

Meanwhile, it is self-evident that homeowners are susceptible to extortion because the value of leasing out an investment property greatly exceeds a $100 per-year-per-home payment.  And it is equally evident that the City is capitalizing on that opportunity in precisely the manner the Sixth Circuit warns of in *Knight* (backdoor use of monopoly permitting power to pay for unrelated basic government services).

And what is at stake when permits are denied or taken due to nonpayment of The Fee is a "basic and familiar uses of property," which is a "right" that "cannot remotely be described as a 'government benefit.'" *Horne v. Dept. of Agriculture,* 135 S.Ct. 2419, at 2430 (2015), i.e. "the ability to lease property is a fundamental privilege of property ownership." *Zaatari v. City of Austin*, 615 S.W.3d 172, at 191 (Tex. App. 2019), citing *Terrace v. Thompson*, 263 U.S. 197, 215 (1923) (noting that "essential attributes of property" include "the right to use, <u>lease</u> and dispose of it for lawful purposes"); *Calcasieu Lumber Co. v. Harris*, 77 Tex. 18, 13 S.W. 453, 454 (1890) ("The ownership of land, when the estate is a fee, carries with it the right to use the land in any manner not hurtful to others; and the <u>right to lease it to others</u>, and therefore derive profit, is an incident of such ownership.").

In fact, Ohio landlords and homeowners "have a constitutionally protected property interest in running their residential leasing businesses free from unreasonable and arbitrary interference from the government." *Mariemont Apartment Assn. v. Vill. of Mariemont*, 2007-Ohio-173, ¶ 40 ("If the building commissioner fails to issue a rental permit, a landlord must cease renting or seeking to rent a unit and cause it to be vacated . . . We deem the landlords' interest to be significant"), citing, *inter alia*, *Asher Invs., Inc. v. Cincinnati,* 122 Ohio App. 3d 126, 136 (1997)("the private interest here is plaintiffs' interest in avoiding daily fines of up to $1,000.00 and loss of use of rental property.  These interests are substantial").

Accordingly, a recent Northern District decision concerning homeowners' rights to lease their homes to others emphasizes that the right to lease homes to others is more highly protected by the Ohio Constitution's guarantees. *Yoder v. City of Bowling Green*, Ohio, No. 3:17 CV 2321, 2019 WL 415254, at p. 3-6 (N.D. Ohio Feb. 1, 2019)( under the Ohio Constitution, private property rights are 'fundamental rights' to be 'strongly protected,'" including "the 'rights related to property, i.e., to acquire, use, enjoy, and dispose of property'").  Thus, Plaintiffs maintain a right to lease that may not be subjected to extortion through permitting demands without triggering the Unconstitutional Conditions Doctrine.[5]

---

[5]    "The existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law."  *Hall v. Meisner,* 51 F.4th 185, 189–90 (6th Cir. 2022).

Accordingly, District Courts within Ohio confirm that conditions leading to "withholding a certificate of occupancy" trigger the unconstitutional conditions doctrine. *Thompson v. City of Oakwood, Ohio*, 307 F. Supp. 3d 761, 778 (S.D. Ohio 2018)("The violation occurred when Oakwood presented Plaintiffs the choice between agreeing to an inspection and being denied a certificate of occupancy").

ii. **There is no "rough proportionality" between the "Out of County Owner Registration Fee" and the impact of leasing a residential home while residing beyond the boundaries of Cuyahoga County.**

A condition that takes land, money, or personal property beyond what is roughly proportionate to the cost imposed by the land use for which the permit is required is unconstitutional. A permit can be conditioned on an exaction only where an "essential nexus exists between the legitimate state interest and the permit condition exacted by the city." *Dolan*, 512 U.S. at 386. Even if a nexus exists, there must also be a "rough proportionality" "between the exactions and the projected impact." *Id.* at 386, 391. In *Koontz*, the Court extended the *Nollan-Dolan* framework to monetary exactions. *See* 570 U.S. at 619. The Fee is predicated on neither an essential nexus nor rough proportionality. Most acute here, however, while there is no "essential nexus" between The Fee and anything at all, there is especially no "rough proportionality" between the The Fee and the "impact" on the City of leasing homes to residents while residing outside of Cuyahoga County.

*First,* the Section 1351.34(c) Fee takes private property (in the form of money) from homeowners residing outside of Cuyahoga County for public use, without compensating the homeowners forced to pay it. And the funds are taken for strictly *public* use: revenue generated by the Outsiders Penalty is placed into the City's general fund, and its use is unrestricted. *Doc. 1-3, PageID 35-36* (email of Assistant Law Director affirming to Plaintiffs that "these fees are deposited into the city's general fund" and "there are no records responsive to your request regarding how those fees are used because they are combined into the general fund").

Housing Director Allan Butler explained that, when the money from collecting The Fee "comes in," it is "added to the general fund," with the caveat that "it is an account within the general fund."   Doc. 24-1,

PageID 459.  Butler was questioned whether out of county "come back to your department [the City's Housing Department] from the general fund?"  Butler responded unequivocally as follows:  "No," and then confirmed that "those fees go to whatever general fund money goes to."  Doc. 24-1, PageID 461.

This means the City spends Class Members funds on literally *anything*:  as a matter of law, funds deposited into a city's "general fund" are unconstrained and can be spent on any public project or purpose. The "general operating fund," or the "general fund," is the fund "from which an expenditure for current expenses may be made.  The general fund is funded by '[a]ll revenue derived from the general levy for *current expense* within the ten-mill limitation, from any general levy for *current expense* authorized by vote in excess of the ten-mill limitation, and from sources other than the general property tax, unless its use for a particular purpose is prescribed by law." *Fisher v. Amberley,* 2015-Ohio-2384, ¶5, citing R.C. 5705.10(A); R.C. 5705.05; R.C. 5705.09.

As such, the taking is materially similar to what the Supreme Court described as forbidden in *Sheetz*: it is an "abuse of the permitting process" and "an out-and-out plan of extortion" where, to gain a permit, a homeowner must meet a condition like "bankrolling a city's holiday party at the local pub" or funding "basis services of government").  *Sheetz v. Cnty. of El Dorado, California,* 601 U.S. 267, 275–76, 144 S. Ct. 893, 900, (2024); *Heck v. City of Freeport,* 985 F.2d 305, 309 (7th Cir. 1993)(identifying the "basic services" of government as "police and fire protection as well as 'quasi-utility functions' like water, garbage, and sewage services"); *Page v. City of Wyandotte, MI,* 666 F. App'x 390, 393–94 (6th Cir. 2016)(municipalities do not charge a fee-for-service to fund the police and fire departments").

This absence of a strict link between any negative externalities caused by Class Members and the indiscriminate frittering away of their funds by the City on any governmental purpose fails the scrutiny required by *Nollan*, *Dolan*, and *Koontz*.  See *Levin v. City & Cnty. of San Francisco*, 71 F. Supp. 3d 1072, 1085–86 (N.D. Cal. 2014)("The payout comes with no restrictions on how it is spent, no ability to ensure that the money be spent on housing or in San Francisco at all, and is not limited to low-income tenants whom the payout might persuade to stay in San Francisco—all factors that weigh against the City's ability to prove

that the exaction 'further[s] the end advanced as the justification' for the Ordinance, in satisfaction of the essential nexus test").  This forces Class Members to alone to bear the public burden of funding roads, police, fire, parks, and other government functions unrelated to their homes, even though "the Takings Clause saves individual property owners from bearing 'public burdens which, in all fairness and justice, should be borne by the public as a whole.'"  *Sheetz, supra*, citing *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563 (1960); see also *Levin, supra.* (the city "seeks to force the property owner to pay for a broad public problem not of the owner's making"); *Drees Co. v. Hamilton Twp.,* 2012-Ohio-2370, at ¶ 22-23 ("The fact that the . . . revenue is earmarked for police protection, fire protection, road improvement, and parks that benefit the entire community is the key factor. The assessments raise revenue for the public's benefit. All members of the community will benefit from improved roadways and parks, as well as from consistent levels of police and fire protection")

*Second*, the City provides no evidence displaying that homeowners dwelling in other counties such as Summit County (like Named Plaintiffs) rather than Cuyahoga County *inflict greater costs* on the City, much less costs of precisely or roughly $100 per unit on an annual basis. *Doc 1, PageID 13, Doc. 1-3.*  Instead, the City of Cleveland Heights simply *speculates*, impermissibly relying upon a homeowner's county of residence as a proxy or surrogate for harm caused to the City by the home, despite the obvious lack of a nexus between the two factors.  *More specifically,* upon request the City was unable to provide records or other evidence substantiating that homes owned by those residing outside of Cuyahoga County impose more costs on the City or receive more governmental benefits from the City.  *Doc. 1-3, PageID 36, 39-40.*

However, *Dolan* requires the City to identify "special quantifiable burdens created by [the property use] that would justify the particular [exactions] which are not required from the public at large," and "some sort of individualized determination that the required [exaction] is related both in nature and extent to the impact of the proposed [use]."  *Dolan,* supra., at 2320-21.

Whatever the case, the City has failed to make the requisite "effort to *quantify its findings* in support" of the imposition of the The Fee.  *Id.*  Rather, pursuant to The Fee, Class Members' leasing of Cleveland

Heights homes while residing in Summit County impermissibly "triggers the mitigation requirement [of The Fee] regardless of the specific impact caused" by Class Members' residency and/or leasing.  *Id.*  In imposing the same $100 annual penalty on all "outsiders," irrespective of the impact they have or even the distance from the City they reside, the City has failed to make "the sort of *individualized* determination that the required dedication [imposed by The Fee] is related both in the nature and extent to the impact" of Plaintiffs' ownership and/or leasing of homes in Cleveland Heights while residing elsewhere.  See *F.P. Dev., LLC v. Charter Twp. of Canton, Michigan,* 16 F.4th 198, 205–08 (6th Cir. 2021); see also *Goss v. City of Little Rock*, 151 F.3d 861, 863 (8th Cir. 1998) (holding that local traffic mitigation requirements did not satisfy *Dolan*'s rough-proportionality test because they were based on pre-set assumptions, rather than an individualized impact assessment).

With respect to the amount of $100 per year per dwelling, the City's only response is that "[t]he City didn't arbitrarily select the amount," because City Council established it.  *Doc. 1-3.*  Thus, The Fee is not calibrated to account for actual costs Plaintiffs' leasing or residential status inflict on the City, the actual benefits, if any, putatively provided by the City, or the taxes and fees that Plaintiffs and others already pay to the City.  This is particularly so when accounting for the reality that no extra costs of "service" are theorized, much less proven:  mail and email work the same way beyond Cuyahoga County.  And there is no indication that the City has need to employ personal service on nonresidents alone at an escalated cost.  See Civ. R. 4.

*Third,* upon Plaintiffs' request, the City was unable to provide records or other evidence substantiating how funds derived assessment of The Fee have been or are being used by the City to "mitigate" the "impact" caused by nonresidents leasing their homes.  *Doc. 1-3, PageID 36, 39-40.*  The City has repeatedly indicated that it does not track how these funds are spent, once transferred into the general fund.  *Id.* (the City's position is that "[t]here are no records responsive to your request regarding how those fees are used because they are combined in the general fund" and "[t]he fees are deposited into the general fund of the City of Cleveland Heights.  The ordinance requiring the registration of dwelling structures by out-of-county owners (CHCO Section 1351.34) does not require the City to maintain an itemized list of what

the fees are being spent on, and therefore such a list does not exist'"); Doc. 43, PageID 958; Doc. 45-1, PageID 1033-34 ("the City does not separately record or track how the fees . . . are expended by the City").

City Housing Director Allen Butler was questioned "has your department been spending a lot more time and resources on out of county landlords' property maintenance cod issues, versus the local landlords' property maintenance code issues?" Doc. 24-1, PageID 460. He responded "we don't track those costs individually . . . we don't keep track of those issues specifically, so I cant' really answer that." Id. Butler was further questioned "Do you know whether or not a majority of your resources are dedicated towards landlords that live out of county, or do you not track that when you are doing that work?" Butler again responded "we don't track the resources that we use for, specifically for that purpose . . . those aren't tracked individually." *Id.*; see also Doc. 24-2, PageID 467 ("*The City does not keep track* or maintain records or information that would" identify "all unique services, benefits, privileges, and /or opportunities provided by the City to [Class Members], or "all costs to the City, in dollars, of [Class Members' conduct]," including service-related issues).

*Fourth,* forcing Plaintiffs and others to pay an additional monetary charge for simply exercising their longstanding right to lease homes they own is arbitrary, duplicative, and a taking. *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155 (1980)("the seizure of the interest earned was unrelated to any service provided by the Florida court system because a separate statute specified a percentage fee that the court clerk would receive to cover his expenses"). Otherwise put, monetary exactions that are redundantly-charged, i.e. charged for public services the homeowner is *already entitled to receive,* impose impermissibly arbitrary conditions on the rights or privileges for which the charges are imposed, and ostensibly amount to takings. The Supreme Court held that the Florida statute allowed the "State, by *ipse dixit,* [to] transform private property into public property without compensation" and invalidated the provision. *Id.* at 164.

Likewise, in *Engelman v. Budish,* the Court of Appeals for the Eighth District concluded that a sewer connection fee was an impermissible monetary exaction due to its duplicative charges:

The salient fact in *Cook* is that "the property owner had already paid the required sewer connection fees to North Olmsted as the agent for the county," therefore, <u>the county's requirement of additional fees was "arbitrary and unreasonable"</u> and did not bear a reasonable relationship to the public health, safety, morals, or general welfare.  Having already paid the fee to an agent of the county, the property owners cannot be required to again pay sewer connection fees directly to the county.

*Engelman v. Budish*, 2015-Ohio-1153, ¶¶ 18-22, 31 N.E.3d 126, 132–33 ("duplication of charges for sewer connection" constituted a "taking"); see also *Cook Rd. Invests., L.L.C. v. Cuyahoga Cty. Bd. of Commrs.*, 2011-Ohio-2151, ¶23 (the taking of money through redundant monetary charges for the same governmental services is "arbitrary and unreasonable" and therefore "an unconstitutional taking of property").

Here, Class Members *already* pay special Section 1347.06(a) fees of $200 per home per year to register their homes and designate an agent through that process.  Doc. 43-2, PageID 892, at 1347.06(a). This, in addition to the reality that they *already* pay property and income taxes to fund general expenses of government such as nuisance abatement, code enforcement, service of process, and other items within the City's litigation and enforcement action agenda.  As such, The Fee cannot plausibly be construed as a user fee to mitigate any of the foregoing, particularly when (1) the City does not impose the same user fee on local homeowners who actually impose the same costs; and (2) the City maintains ample vehicles for recovering such costs from *actual* wrongdoers once they're *actually* incurred.  See *Drees Co. v. Hamilton Twp.,* 2012-Ohio-2370, at ¶ 22-23 ("As taxpayers and residents of Hamilton Township, they are entitled to police and fire protection and to use township parks and roadways. They already pay taxes for those services; in fact, when they improve their property, they pay higher taxes than they did when the property was undeveloped. But targets of the assessment receive no greater benefit than any other taxpayer despite the payment of the additional assessment."   These general expenses are to be funded transparently, through levies, not through the backdoor, with surreptitious exactions such as those here.  see *Fisher v. Amberley,* 2015-Ohio-2384, ¶41.

*Finally,* the City attempts to recast The Fee as a "processing" or "application" fee rather mitigating outside ownership.  This incredulous claim fails:  (1) the City doesn't track the costs of processing the applications; (2) the City deposits The Fee into its general fund rather than into a fund calibrated to offset

processing costs; (3) there are no processing costs because the City does not review Class Members' applications for permits; (4) there is no need to process an "application" that provides the same exact information already within the possession of the City, much less multiple times over and over again (for each house, each year, rather than once per homeowner); (5) the City fabricated this putative justification late in the litigation, after attempts at other hollow justifications failed; and (6) above all else, there is no textual requirement whatsoever mandating that The Fee be used in such a manner.  Further, the City concedes it "does not keep any records that track the actual cost of processing out-of-county registration applications," or "any singular out-of-county registration application," nor does it "track any variable costs" or know any "factor that determines the variability of the aforesaid cost(s)."  Doc. 24-2, PageID 469.  Moreover, there is no limiting principle to this proposition:  by the City's logic, it could charge $10,000 per year per home to nonresident homeowners "to apply."

The Fee imposes an unconstitutional condition on Plaintiffs' rights to own and/or lease homes in Cleveland Heights while residing outside of Cuyahoga County.[6]  Accordingly, The Fee should be declared unconstitutional, and the City must be enjoined from taking any action to enforce the The Fee, i.e. to prosecute, punish, or retaliate against Plaintiffs for leasing without complying with The Fee.  In addition, funds taken from the Class Members through imposition if The Fee must be returned to those Class Members.

---

[6]     The City imposes The Fee even on those who live in closer proximity to the City than those on whom it does not impose that Penalty.  For Named Plaintiffs, the distance from Cleveland Heights, is less than the distance in miles or minutes from the majority of western Cuyahoga County residents that are not subject The Fee.  Homeowners residing in Strongsville, for instance, which is in Cuyahoga County, are 2.4 miles further from Cleveland Heights than Plaintiffs' location in Richfield, Ohio (Summit County).  Mr. Strigle, although in Summit County, dwells just 21 minutes from Cleveland Heights, and can reach the City within 34 minutes via Interstate 271.  *Doc. 1, Doc. 5.*  Thus, externalities due to distance from Cleveland Heights could not justify imposition of The Fee - - Homeowners in Strongsville, Bay Village, Westlake, or North Olmsted reside further away, and also "out of town landlords" whose costs "must be mitigated," but are not.

**B. Plaintiffs are entitled to prevail on the merits of their retrospective and prospective Fourteenth Amendment claims.**

Pursuant to Section 1 of the Fourteenth Amendment to the United States Constitution, a state actor may not "abridge the privileges or immunities of citizens of the United States," "deprive any person of life, liberty, or property, without due process of law," or "deny to any person within its jurisdiction the equal protection of the laws." These guarantees' Ohio counterparts provide greater protection yet in this context.

Analyzing The Fee in light of applicable standards of scrutiny results in the conclusions that The Fee is subject to heightened scrutiny and impermissibly fails such scrutiny. In accordance, the City must be permanently enjoined from relying upon and ordered to disgorge funds wrongfully collected pursuant to it.

**i. The Fee is subject to heightened Equal Protection scrutiny.**

*First,* the Equal Protection Clause "demands that similarly situated persons be treated similarly under the law." *Sonnier v. Quarterman,* 476 F.3d 349, 367–68 (5th Cir.2007) (citing *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382 (1982)). The Equal Protection Clause ensures protection against intentional and/or arbitrary discrimination. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073 (2000). As such, a "classification created by [a] residence requirement, 'unless shown to be necessary to promote a compelling governmental interest, is unconstitutional." *Mem'l Hosp. v. Maricopa Cnty.,* 415 U.S. 250, 250–88, 94 S. Ct. 1076, 1078–97 (1974), citing *Shapiro v. Thompson,* 394 U.S. 618, at 634, 89 S.Ct. 1322, at 1331. When government discriminates on the basis of residency, it bears a "heavy burden of justification" and must employ "means that do not unnecessarily burden constitutionally protected interests." *Id.* And "[a] State may not protect the public fisc by drawing an invidious distinction between classes of its citizens." *Id.*

In accordance, the Supreme Court employs the Equal Protection Clause to forbid unequal assessment on the basis of residency alone. In *Metropolitan Life Ins. Co. v. Ward*, the Supreme Court invalidated an enactment that "impose[d] a substantially lower gross premiums tax rate on *domestic* insurance companies than on *out-of-state* (foreign) insurance companies." 470 U.S. 869, 105 S.Ct. 1676 (1985). The Court held that "The Alabama domestic preference tax statute violates the Equal Protection Clause" because

24

"discriminating against nonresidents is not a legitimate state purpose," reasoning that "Alabama's purpose constitutes *the very sort of parochial discrimination that the Equal Protection Clause was intended to prevent*," that "[a] State may not constitutionally favor its own residents by taxing foreign corporations at a higher rate solely because of their residence," and that "[e]qual protection restraints are applicable even though the *effect* of the discrimination is similar to the type of burden with which the Commerce Clause also would be concerned." *Id.,* at pp. 1680-1684.

This "view that [a local government] may not constitutionally favor its own residents by taxing foreign[ers] at a higher rate solely because of their residence is confirmed by a long line of this Court's cases so holding." *Ward*, supra, citing *WHYY, Inc. v. Glassboro,* 393 U.S., at 119-120, 89 S.Ct., at 287; *Wheeling Steel Corp. v. Glander,* 337 U.S., at 571, 69 S.Ct., at 1296; *Hanover Fire Ins. Co. v. Harding,* 272 U.S., at 511, 47 S.Ct., at 183 (With respect to general tax burdens on business, "the foreign corporation stands equal, and is to be classified with domestic corporations of the same kind . . . In all of these cases, the discriminatory tax was imposed by the State on foreign corporations doing business within the State solely because of their residence . . ."); *Southern R. Co. v. Greene,* 216 U.S., at 417, 30 S.Ct., at 291; *Reserve Life Ins. Co. v. Bowers,* 380 U.S. 258, 85 S.Ct. 951 (1965); *Armour v. City of Indianapolis, Ind.,* 566 U.S. 673, 681–93, 132 S. Ct. 2073, 2080–87 (2012)(acknowledging heightened Equal Protection scrutiny for "cases involve[ing] discrimination based on residence or length of residence"); *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309 (state dividend distribution system that favored long-term residents); *Hillsborough v. Cromwell,* 326 U.S. 620, 623, 66 S.Ct. 445 (1946)("The equal protection clause ... protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class").

Likewise, in *Williams v. Vermont,* the Court found a residence-based assessment on the purchase of vehicles to violate equal protection guarantees, explaining that Vermont's tax credit offsetting its use tax was impermissibly "*available, however, only if the registrant was a Vermont resident at the time he paid the taxes,*" and that "residence at the time of purchase is a wholly arbitrary basis on which to distinguish among

present Vermont registrants" because "the distinction between them bears no relation to the statutory purpose of raising revenue for the maintenance and improvement of Vermont roads." 472 U.S. 14, 14–37, 105 S. Ct. 2465 (1985). This robust body of precedent displays that courts must employ heightened scrutiny when adjudicating residency-based assessments.

### ii. The Fee is subject to heightened Privileges and Immunities Clause scrutiny.

The City claims the right of nonresidents to own and lease homes located within the City is no "right" at all, but rather a "privilege provided by the City of Cleveland Heights." Doc. 45-1, PageID 1052. "The object of the Privileges and Immunities Clause is to 'strongly ... constitute the citizens of the United States one people," by "plac[ing] the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned." *Lunding v. New York Tax Appeals Tribunal*, 522 U.S. 287, 296, 118 S. Ct. 766, 773–74, (1998), citing *Paul v. Virginia,* 8 Wall. 168, 180 (1868). One right thereby secured is the right of a citizen of any State to "remove to and carry on business in another without being subjected in property or person to taxes more onerous than the citizens of the latter State are subjected to." *Id.,* citing *Toomer v. Witsell,* 334 U.S. 385, 396, 68 S.Ct. 1156, 1162 (1948); *Ward v. Maryland,* 12 Wall. 418, 430 (1871).

In *Toomer v. Witsell*, the Supreme Court invalidated a South Carolina statute that required nonresidents to pay a fee greater than that paid by residents for a license to shrimp commercially in the three-mile maritime belt off the coast of that State. 334 U.S. 385, 68 S.Ct. 1156 (1948). The Court reasoned that the Privileges and Immunities Clause "does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." *Ibid*. A "substantial reason for the discrimination" would not exist, the Court explained, "unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the [discriminatory] statute is aimed." *Id.*, at 398, 68 S.Ct., at 1163. Moreover, even where the presence or activity of nonresidents causes or exacerbates the problem the State seeks to remedy, there must be a "reasonable relationship between the danger represented by non-citizens, as a class, and the . . . discrimination practiced upon them." *Id.*, at 399,

68 S.Ct., at 1164.  *Toomer*'s analytical framework was confirmed in *Mullaney v. Anderson*, 342 U.S. 415, 72 S.Ct. 428 (1952), where it was applied to invalidate a scheme used by the Territory of Alaska for the licensing of commercial fishermen in territorial waters; under that scheme residents paid a license fee of only $5 while nonresidents were charged $50.  See *Hicklin v. Orbeck,* 437 U.S. 518, 525–26 (1978).

The most recent prominent application of this guarantee is particularly on point *sub judice*: the Fourth Circuit's rejection of one county's attempt to hamper real estate investors residing outside of the county for invidious reasons similar to those proffered by the City here.  *Brusznicki v. Prince George's Cnty.*, 42 F.4th 413, 420-23 (4th Cir. 2022)("the Tax-Property statute betrays a paradigmatic protectionist impulse designed to benefit County residents at the expense of outsiders rather than advance any legitimate state interest . . . the statute point-blank prevents Plaintiffs from bidding on property that Prince George's residents buy up at the limited auction. And the subdued competition at the limited auction allows the County's residents to purchase property at reduced rates. That is the definition of protectionism").

The *Brusznicki* Court explained "nothing in the Supreme Court or this Court's jurisprudence has ever permitted a State to intentionally giv[e] its own citizens a competitive advantage in business or employment . . . And our decision today closely tracks the well-established ones discussed above, invalidating licensing schemes that charge nonresidents discriminatory rates or require nonresidents to pass additional tests. *Brusznicki*, supra., at 423.

In so explaining, the *Brusznicki* Court rejected rationales akin to those proffered by the City here:

The Attorney General argues the County has a compelling goal in refurbishing the neighborhoods, promoting homeownership, and reducing blight. Even assuming those constitute appropriate state goals, meeting them does not require excluding nonresidents. Start with improving neighborhoods and reducing blight. Neither logic nor the record offers any reason to believe nonresidents would do a worse job revitalizing vacant properties than County residents or employees. The Attorney General provides no evidence, for example, that homes purchased by nonresidents remain abandoned for longer than homes purchased by residents. Quite the opposite, opening up the auction to more bidders may allow those with the most funds to purchase the properties, potentially accomplishing the County's goal much faster. The Attorney General himself admits, in a move we believe gives the game away, that "out-of-area tax-sale investors do not necessarily cause these evils, and in some respects can be regarded as performing a public service."  That leaves us with exactly the kinds of arguments the Supreme Court rejected many times before . . . Even granting the Attorney General's premise—that residents build back faster—the County can achieve its revitalization goals by employing "alternative means" that do not give rise to constitutional concerns.

27

*** 

> The same goes for promoting homeownership. The Attorney General provided no figures showing the County has a large population experiencing homelessness or that its property values are so high that people who work in the County cannot afford to live there. But even if such evidence existed, it would not suffice to enact protectionist measures unless the Attorney General could demonstrate that "non-citizens constitute a peculiar source of th[at] evil."

*Brusznicki*, supra., at 424-25, citing *Supreme Ct. of Virginia v. Friedman,* 487 U.S. 59, at 67-68

(1988)(repudiating Virginia's unsupported assertion that non-resident lawyers have less commitment to and

familiarity with Virginia law absent concrete evidence in the record), and *Toomer*, 334 U.S. at 398

(discrimination unjustified because the record failed to demonstrate that nonresident shrimp fisherman

fishing techniques harmed the State more than the residents' practices).  In sum, state and local governments

must "directly abate" the harms they seek to ameliorate without "discriminating against nonresidents."  *Id.,* at

425.

When applied here, the foregoing precedent dovetails seamlessly with the impermissibility of

government mandates or limits rooted in either invidious discrimination or naked protectionism.   In

*Cleburne,* the Court was clear that mere subjective angst towards outsiders cannot suffice: "denying a permit

based on vague, undifferentiated fears is again *permitting some portion of the community to validate what

would otherwise be an equal protection violation*."  *Id.,* at 447-449 ("the Council was concerned with the

negative attitude of the majority of property owners located within 200 feet of the Featherston facility . . .

But mere negative attitudes, or fear . . . are not permissible bases . . .").  Likewise, the "bare ... desire to harm

a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v.

Moreno*, 413 U.S. 528, 534, 93 S.Ct. 2821 (1973).

Without doubt, "out-of-town" landlords are unpopular.  They are often viewed as wealthy, and they

cannot vote.  They make for an easy scape goat.  As other collectivists stereotypes fade or are forced into the

shadows, Class Members remain maligned and disfavored.   However, given the absence of evidence of any

actual connection between the county of residency of a homeowner and his or her negative impact on the

City of Cleveland Heights, this Court must account for the reality that the City's avowed governmental interests are simply pretextual and invidious.

In culmination, with respect to scrutiny, the Supreme Court is clear:  "Our concern for the integrity of the Privileges and Immunities Clause is *reflected through a "standard of review substantially more rigorous* than that applied to state tax distinctions, among, say, forms of business organizations or different trades and professions."  *Lunding*, supra, at 774-75.  Thus, the City must defend The Fee with a "substantial justification for its different treatment of nonresidents, including an explanation of how the discrimination relates" to the City's "justification."  However, the City has supplied no evidence demonstrating that homeowners who live beyond the borders of Cuyahoga County are "uniquely evil."  *Brusznicki,* supra., at 424–25 ("[a]bsent some evidence that nonresidents take homeownership opportunities away from County residents or employees, the protectionist remedy cannot stand").

### iii. The Fee is subject to heightened scrutiny by virtue of the Ohio Constitutions due process and property rights protections.

The Ohio Constitution is more protective of Plaintiffs' property rights, and mandates that trammel these rights warrant enhanced scrutiny.  A recent Northern District Court's decision concerning homeowners' rights to lease their homes to others emphasizes that the right to lease homes to others is more highly protected by the Ohio Constitution's guarantees.  *Yoder v. City of Bowling Green*, Ohio, No. 3:17 CV 2321, 2019 WL 415254, at p. 3-6 (N.D. Ohio 2019)("First, under the Ohio Constitution, private property rights are 'fundamental rights' to be 'strongly protected.'  Although the *Norwood* court dealt with a takings claim, it described the 'rights related to property, i.e., to acquire, use, enjoy, and dispose of property' as 'among the most revered in our law and traditions'").  Accordingly, the District Court accurately concluded that "the Ohio Constitution is more protective of private property rights than its federal counterpart, <u>and the Ohio Supreme Court insists upon a more stringent Equal Protection analysis</u> . . . something higher than rational basis review, but less than strict scrutiny to cases involving property rights."  *Yoder,* citing *Norwood,* supra*.,* and Jeffrey S. Sutton, 51 Imperfect Solutions: States and the Making of

American Constitutional Law 198 (2018), at 16 ("Nothing compels the state courts to imitate federal interpretations of the liberty and property guarantees in the U.S. Constitution when it comes to the rights guarantees in their own constitutions").

And in *State v. Mole*, the Ohio Supreme Court affirmed that the Ohio Constitution's equal protection guarantees can be applied to provide greater protection than their federal counterparts.  *State v. Mole*, 2016-Ohio-5124, ¶¶ 14, citing *Arnold v. Cleveland,* 67 Ohio St.3d 35, 42 (1993).  Accordingly, in Ohio, "[t]he attempted classification 'must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made <u>arbitrarily</u> and without any such basis' . . . classifications must have a reasonable basis and <u>may not 'subject individuals to an arbitrary exercise of power</u>."  *State v. Mole*, 2016-Ohio-5124, ¶¶ 12-29.

Finally, with respect to Ohioans Due Process guarantees, Ohio Courts apply Sections 1, 16, and 19 of the Ohio Constitution as providing for scrutiny well beyond that courts apply in federal constitutional analysis:  **"**The means adopted to accomplish the legislative purpose must be suitable to the end in view, must be impartial in operation, must have a real and substantial relation to such purpose and must not interfere with private rights beyond the necessities of the situation.' " *Hausman v. Dayton*, 73 Ohio St.3d 671, 678 (1995), citing *Teegardin v. Foley*, 166 Ohio St. 449 (1957), paragraph one of the syllabus. "Essentially, to avoid violating due process, legislative action must bear a real and substantial relation to public health and welfare, and not be unreasonable or arbitrary." *Id*., citing *Mominee v. Scherbarth*, 28 Ohio St.3d 270, 503 N.E.2d 717 (1986).  And "[p]rivate rights must not be arbitrarily or unreasonably infringed. *See Dragelevich v. City of Youngstown*, 176 Ohio St. 23, 30 (1964); *White v. Cincinnati,* 2021-Ohio-4003, ¶ 50, 181 N.E.3d 583, 593–94, *appeal not allowed*, 2022-Ohio-743, ¶ 50, 166 Ohio St. 3d 1428.

### iv.  Discrimination against nonresidents through imposing a duplicative Fee solely upon them, to fund exclusively public ends, is impermissibly arbitrary and fails any scrutiny.

The Fee's persistently-discriminatory application fails to substantially advance either governmental interest.

a.  **There is no permissible justification for imposing The Fee.**

*First*, the City cannot explain why it levies The Fee.  Originally, the City attributed the need for The Fee its costs of recouping "service on out of county property owners who failed to maintain the condition of local residential dwellings."  Doc. 11, PageID 122.  However, when asked to identify those costs, the City indicates "the City does not keep track of the total amount of costs incurred by the City," much less "as a result of out of county property owners who fail to maintain the condition of local residential dwellings." Doc. 45-1, PageID 1034.  Nor can the City identify even one example of when such a cost was ever incurred. *Id.*.  Nor can the City confirm that costs imposed homeowners residing beyond Cuyahoga Couty exceed costs imposed by homeowners who lease while residing within Cuyahoga County . . . the City "does not separately track whether the owner of a dwelling unit that becomes the subject of a notice of violation resides inside Cuyahoga County."  *Id.,* at 1036*.*

Upon inquiry into why levying The Fee, at this particular amount or any amount, is "necessary" to maintain the condition of homes, register nonresident homeowners, or notify nonresident homeowners, the City maintains no coherent response, resorting to vague allusions to countering "a general feeling of poor maintenance and neglect," "loss of historic architectural integrity," and "quality of life issues."  Doc. 45-1, PageID 1039-47.  Indeed, the City concedes it performed no analysis, individualized or otherwise, or regarding calibration of the amount or otherwise, prior to electing to impose The Fee.  Id., at 1048-49.  According to the City, rather, it "does not have any legal obligation to satisfy a 'rough proportionality' standard for the out-of-county registration requirement."  *Id.,* at 1049.

*Second,* the City fails to even verify its claim that those outside of Cuyahoga County are *more difficult to contact*.  Evidence surrounding the Named Plaintiffs' payment of The Fee is illustrious:  (1) the City had no trouble immediately contacting them in Summit County to supply granted "Out of County Certificates of Registration;" (2) the City directly contact Named Plaintiffs by email to order them to pay $100 per property; and (3) the City apparently spent no time and resources reviewing Plaintiffs' applications for the designation of a local agent prior to taking Plaintiffs' funds and reflexively granting all 19 of

Plaintiffs' applications, signed off on by the City's Housing Program Director.   See *Doc. 26, 26-1* (Declaration of Andrew Strigle and sample approved Certificate of Out of County Owner Registration); see also *Doc. 24-1, PageID 461, p. 31-32* ("I couldn't tell you that I have knowledge of that owner or Plaintiff . . . I don't recall that there would have been a major problem or not . . . there is nothing that crosses my mind right now that sets them aside").

*Third,* there are no extra administrative costs to the City in requiring homeowners from beyond Cuyahoga County to designate a local contact.   To the contrary, the City's basic application for a Certificate of Occupancy already requires *all* homeowners who lease, within or beyond the county, to identify a local "agent or person in charge of the property," "the resident agent in charge of the building or structure," and "the nonresident agent."   Doc. 5-2, PageID 83 (Section 1347.02(a), (c)(2)).   Thus, leasing homes while residing beyond Cuyahoga County inflicts no additional unique costs upon the City that could justify imposition of a discriminatory penalty.

*Fourth*, the City's Outsiders Penalty is materially similar to the discriminatory assessments enjoined by the Supreme Court in *Williams v. Vermont* and *Metropolitan Life Ins. Co. v. Ward.*

As in those cases, homeowners residing beyond the boundaries of Cuyahoga County cannot limit, ameliorate, or reduce the Outsiders Penalty no matter how clean, safe, or pristine the condition of the property they own in Cleveland Heights.   See *Ward*, supra.   ("Domestic insurers remain entitled to the more favorable rate of tax regardless of whether they invest in Alabama assets. Moreover, the investment incentive provision of the Alabama statute does not enable foreign insurance companies to eliminate the discriminatory effect of the statute").   As in those cases, the Outsider Penalty is not imposed if the homeowner resides within a favored political subdivision, irrespective of all other considerations.   See *Williams,* at 14 ("the credit is available, however, only if the registrant was a Vermont resident at the time he paid taxes").

*Fifth,* as in those cases and others, the Outsider Penalty impermissibly relies on just one typically-unrelated variable (residency) as a proxy for the City's interest in recovery costs it claims it incurs in addressing nuisances.   However, "the State may not rely on a classification whose relationship to an asserted

32

goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 446–50 (1985); see also *Yoder v. City of Bowling Green, Ohio*, No. 3:17 CV 2321, 2019 WL 415254, at 3–6 (N.D. Ohio Feb. 1, 2019)("[t]he dwelling limit is impermissibly arbitrary, oppressive, and untailored . . .Within the regulations, the City claims to be effectuating a governmental interest in limiting population density. * * * But the City's dwelling limit only focuses on the type of relationship between those living together in a home").

As in *Yoder,* the City impermissibly focus on identity to recover nuisance abatement costs, thus penalizing those with the "wrong" identity who do no harm (nonresidents), while letting those with the "right" identity who do harm (local) entirely off the hook.  Courts can and do remedy such arbitrary proxies for harm, particularly when that proxy is status, identity, or residency.  See *Hoffman v. Vill. of Pleasant Prairie,* 249 F. Supp. 3d 951, 962 (E.D. Wis. 2017)("The Village has admitted that it has no evidence that the difference between these groups—domicile at the time of their last offense—has any bearing on their safety risk to the community . . . the Ordinance violated Plaintiffs' equal protection rights in making an irrational domicile-based distinction between Designated Offenders").  In sum, employing just one untethered status-based variable as a surrogate for actual harm caused or projected expenses is impermissibly overbroad, underinclusive, and arbitrary.

*Finally,* the City's distinctions are arbitrary, even with respect to residency itself.  It arbitrarily excludes from The Fee individuals that reside further away from the City of Cleveland Heights, but within Cuyahoga County, while imposing The Fee on *responsible* Class Members who reside *closer* to Cleveland Heights.  This is to say nothing of the requirement to pay The Fee, multiplied by 20, each year, when a homeowner maintains the same local agent on all 20 homes for many successive years.

**b. There is no legitimate governmental basis, pursuant to *any* degree of scrutiny for imposing a *repealed* fee on non-residents.**

The City insists that its expressly-discriminatory Fee is immunized from scrutiny on the basis that courts must defer to local governments' legislative choices.  This insistence is undermined, especially for the

period from December of 2020 through June of 2023, by the reality that the City repealed The Fee in December of 2020.

Thus, the cornerstone for limitations on judicial review and analysis, whatever the level of scrutiny, is inapplicable for that period of time. See *Armour v. City of Indianapolis, Ind.,* 566 U.S. 673, 680–81, 132 S. Ct. 2073, 2079–80 (2012)("rational basis review" arises from federal courts' "deference to reasonable underlying legislative judgments"), relying on *United States v. Carolene Products Co.,* 304 U.S. 144, 152, 58 S.Ct. 778 (1938) (due process). *Caroline Products* itself acknowledges that "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." *Id.,* at 153. Here, the ultimate "fact" has "ceased to exist": the existence of the municipal code section authorizing imposition and collection of The Fee. Moreover, what is owed deference, if anything, is the City's "legislative judgment" in *repealing* the Section 1351.34(c) Fee. Consequently, *no basis* justifies collection of The Fee during the period for which Class Members' class is certified, up until the point of reenactment. This reality alone justifies recovery of fees paid by Class Members during this period of time.

c. *Post Hoc* **reliance on Section 1369.16 does not justify imposing The Fee during the repeal of Section 1351.34(c).**

No deference is owed to an *administrative interpretation* that a Municipal Code Section *other than* Section 1351.34(c) authorized it to continue to collect the Section 1351.34(c) Fee.

Here, the municipal code section in effect during the City's repeal of The Fee that it claims justified continued collection of The Fee is Section 1369.16. Through Ordinance Number 104-2023, the City amended this Section in response to the claims in this case effective June 22, 2023. From December 1, 2020 through June 22, 2023, the version of that Section in effect provided as follows:

**1369.16 REGISTRATION OF <u>BUSINESS</u> STRUCTURES BY OUT-OF-COUNTY OWNERS.**

(a) <u>If a business structure, including without limitation a commercial, industrial or institutional structure,</u> located within the City is owned by a person or persons, none of whom reside within Cuyahoga County, the owner(s) of <u>the dwelling structure,</u> within thirty (30) days after the effective date of this Section 1369.16 or within thirty (30) days after obtaining ownership of the structure, whichever is later, and

annually thereafter, shall register with the Commissioner of Buildings on a form prescribed by the Commissioner of Buildings and designate an authorized agent for each structure. The authorized agent must be a natural person eighteen (18) years of age or older who maintains a physical office in Cuyahoga County, Ohio, or actually resides within Cuyahoga County, Ohio. By designating an authorized agent under the provisions of this section, the owner is consenting to receive any and all notices of violations of City ordinances and to receive process, in any court proceeding or administrative enforcement proceeding related to the use or maintenance of the property or business structure, including, but not limited to, proceedings related to the enforcement of the Business Maintenance Code or Building Code, by service of the notice or process on the authorized agent. The failure of the owner of the structure to obtain a deed for the property or to file the deed with the County Recorder shall not excuse the owner from compliance with this Section 1369.16.

\*\*\*

(c) The registration fee under this Section 1369.16 shall be $100.00.

(*Ord. 170-2012. Passed 12-3-12; Ord. 180-2013. Passed 10-21-13*)

Doc. 1-2, PageID 31-32 (emphasis added to highlight issues). The first sentence of prior Section 1369.16 features an abject non sequitur:  "if" certain conditions with respect to the "business structure" are met, then the nonresident owner of "the dwelling structure" must pay the Section 1369.16(c) fee.  *What* dwelling structure?  The introduction of Section 1369.16(a) does not inform us with its exclusive reference to a *business* structure.  The Section then later shifts back to referencing "the business structure."  What happened is clear to all parties:  the City copied and pasted its preexisting Section entitled "REGISTRATION OF DWELLING STRUCTURES BY OUT-OF-COUNTY OWNERS," dating back to 2007, when it created the business registration fee in 2012.  While this may initially appear to be a lucky mistake by the City, basic statutory construction within this context demonstrates otherwise.  This ambiguous-at-best text fails to justify imposition and collection of The Fee during the period from January 31, 2021 through June 22, 2023.

First, this Court owes no deference to the administrators' construction of Section 1369.16 so as to justify collection of The Fee from Class Members while The Fee was otherwise repealed.  Those within the City's legal department maintain no special expertise in interpreting the City's ordinances that exceed that of any court.  *Twism,* supra., at ¶47 ("When it comes to interpretation of text involving common words used in their ordinary sense, there will rarely, if ever, be a need for a court to look to an agency interpretation. This task is routinely performed by courts and is well within the judiciary's core competence . . . it remains the judiciary's role to independently interpret the law").

35

*Second,* courts interpret Ohio municipal ordinances and resolutions in the same manner as Ohio statutes. *Willow Grove, Ltd. v. Olmsted Twp. Bd. of Zoning Appeals*, 2022-Ohio-4364, 169 Ohio St. 3d 759, 764–65, at ¶18.  One big difference:  "Importantly, titles and headings—especially those chosen by the legislative body, as opposed to ones placed there by a publisher or codifier—might aid in discerning the intent of a law if its intent is not clear through its plain text."  *Willow Grove,* supra., at ¶28.  "[H]eadings are 'guideposts' because they indicate the type of information that follows," can also be "substantive," and their text must be given effect. *Id.*, at ¶21.

Here, the heading to Section 1369.16 references its application as exclusively to "business" structures, Section 1361.06 provides the definition of "business" as applied in Chapter 13 of the Cleveland Heights Codified Ordinances: "'Business' means all uses or occupancies *other than residential*.'"  Leasing residential homes to tenants who live therein is plainly a "residential occupancy." See R.C. 5321.01(C)("'Residential premises' means a dwelling unit for residential use and occupancy and the structure of which it is a part, the facilities and appurtenances in it, and the grounds, areas, and facilities for the use of tenants generally or the use of which is promised the tenant").  Further, 1369.16(a) *describes* a business structure as the opposite of a "residential" use, i.e., "a commercial,[7] industrial or institutional structure, located within the City."  Doc. 1-2, PageID 31.  Next, it cannot be ignored that the City titles Chapter 1369 of its Municipal Code as "Basic Standards for Business Occupancy."[8]

Ultimately, the City differentiates between a business structure and a dwelling structure through the separate codified ordinances addressing the regulation of each.  *Compare Codified Ordinance 1369.16 ("Registration of Business Structures by Out-of-County Owners")* with *Cleveland Heights Codified*

---

[7]  The only Ohio appellate courts to have considered the issue have expressly clarified that leasing a dwelling unit to someone who resides within the unit is a *residential* use rather than *"commercial"* in nature.  In *Kinzel v. Ebner*, the Court of Appeals for the Sixth District concluded that "rental of the single-family homes was not a 'commercial use' of the property." 2020-Ohio-4165, ¶¶ 71-72, 157 N.E.3d 898, 914–17.

[8]  Available online at  *https://codelibrary.amlegal.com/codes/clevelandhts/latest/clevelandhts_oh/0-0-0-18144.* ("CHAPTER 1369 Basic Standards for Business Occupancy (amlegal.com)").  Last checked October 30, 2024.

*Ordinance 1351.34 ("Registration of <u>Dwelling</u> Structure by Out-of-County Owners").*  The City's separate Section governing "Registration of Dwelling Structure[s] by Out-of-County Owners" would be rendered superfluous by the City's putative application of Section 1369.16 to leased residential homes.

*Third,* the context here supports construing Section 1369.16 as insufficient authorization to impose the Outsiders Penalty:  Defendants' steadfastly maintained Plaintiffs were subject to Section 1351.34, right up until that point that Plaintiffs brought to the City's attention that this Section no longer contained a $100 annual Outsider Penalty.  Doc. 1-3, PageID 44-45; see also PageID 41 ("the City does expect you to comply with the law, by registering your properties, designating an in-county agent, and paying the fee. The penalty for not abiding by Section <u>1351.34</u> is a [first-degree] misdemeanor").  Only then did the City make the leap to claiming that Section 1369.16 justified the same penalty on *residential* homes.

*Fourth,* it is not insignificant that the City noticed and corrected the defective reference to "dwelling" in Section 1369.16(a):  the City's June 22, 2023 amendment removes that word "dwelling" and replaces it with "business."  For the foregoing reasons, Section 1369.16(c) fails as an authorization to impose the Outsiders Penalty during the period in which Section 1351.34(c) was repealed.  As such, not even a legitimate governmental interest or rational basis for imposing and collecting The Fee existed during the period in question.  Consequently, the City's enforcement transgressed basis due process and equal protection guarantees.  And these funds must be returned to Class Members.

## III. CONCLUSION

The City would prefer that all who own homes within its limits also live in Cuyahoga County and never move away, or sell to a local immediately when they move away.  "It is the role of the judiciary, however, to ensure the protection of individual rights."  *KindHearts for Charitable Humanitarian Development, Inc. v. Geithner*, 710 F.Supp.2d 637 (N.D.Ohio, 2010).  And once the City is enjoined from enforcing the impermissible Section 1351.34 Fee, it will remain free to return to the drawing board to craft more precise standards. *Sessions v. Dimaya,* 138 S. Ct. 1204, 1224–29 (2018)(Gorsuch, concurring)(treating the challenged term as a nullity "has the salutary effect of inducing the legislature to reenter the field and

make itself clear by passing a new law").  In the instant, the City must be enjoined from relying upon The Fee as a basis for prosecuting, imposing fines upon or otherwise retaliating against Class Members. Likewise, the City must now return impermissibly extracted fees.

Respectfully submitted,

*/s/ Maurice A. Thompson*
Maurice A. Thompson (0078548)
1851 Center for Constitutional Law
122 E. Main Street
Columbus, Ohio 43215
Tel: (614) 340-9817
*MThompson@OhioConstitution.org*

Michael R. Rasor (0086481)
Cavitch, Familo & Durkin
1300 East Ninth Street – 20th Floor
Cleveland, OH 44114
Tel:  (216) 472-4650
*MRasor@Cavitch.com*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all defendants through this Court's electronic filing system on the date of filing.

Respectfully submitted,

/s/ *Maurice A. Thompson*
Maurice A. Thompson (0078548)