# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **THE CROSSROADS GROUP, LLC, et al.,** | : | **Case No. 23-cv-184** |
| | : | |
| **Plaintiffs,** | : | **Judge Calabrese** |
| | : | |
| **-vs-** | : | |
| | : | **MEMORANDUM IN REPLY IN SUPPORT** |
| **CITY OF CLEVELAND HEIGHTS, OHIO, et al.,** | : | **OF PLAINTIFFS-CLASS MEMBERS** |
| | : | **MOTION FOR PARTIAL SUMMARY** |
| **Defendants.** | : | **JUDGMENT** |
| | : | |

Neither acquisition of contract information from Class Members nor claimed costs of Notification/Correspondence and "Service of Process," in and of themselves, justify imposition of The Fee on all nonresidents of Cuyahoga County. Nor do any claimed costs of hypothetical externalities imposed by Class Members' leasing within the City justify imposition of The Fee on nonresidents.

Consequently, Class Members are entitled to prevail on the merits of their Fifth and Fourteenth Amendment claims irrespective of whether The Fee is imposed (1) to acquire contact information of Class Members; (2) to offset speculative costs of notifying and/or serving Class Members with process; or (3) to offset the costs of vaguely-described negative externalities directly imposed on the City by the condition of Class Members' homes.

## I. ISSUES

The City's Memorandum is helpful in crystalizing the critical issues: it explicitly avows just one justification for The Fee: it has "merely adopted an out-of-county registration requirement and related $100 registration fee" which maintains an aim of "ensuring that the City has a local agent who can receive service of process and violation notices." Doc. 48, PageID 1124; Doc. 48, PageID 1126 (avowing governmental interest of "having out-of-county landlords designate a local agent to receive service of process and notices of violation." And the amount of $100 annually per residence is "proportionate," the City says, to its costs in enabling "serving process and notices of violation." *Id.*

1

In making this contention, the City now relies on the new legislative findings contained in the preamble to the revised version of its residential Outsiders Penalty.   The preamble to the City's post-litigation version of Section 1351.34 now indicates "the City of Cleveland Heights has collected a $100 registration fee [sic] to <u>offset the cost of processing and enforcing the out-of-county registration requirement</u>." Doc. 43-4, PageID 937.  The City then tells us precisely why this one-of-a-kind "registration requirement" exists:  the preamble now specifies that the City's requirement that a nonresident homeowner designate an agent is *an attempt to reduce costs otherwise associated with* service or transmission directly to the nonresident homeowner, as "related to the use or maintenance of the structure," of "notices of violations of City ordinances," and/or "process in any court proceeding or administrative enforcement proceeding." Doc. 43-4, PageID 937.  Thus, the Fee is transitively the functional equivalent of an impact fee:  the City seek to offset costs to the City of having to adequately notify nonresident homeowners of problems related to their homes.

With respect to those notification costs, the City's new preamble suggests that they occur because the City has "received complaints from residents of poorly-maintained rental properties owned by investors from outside of the City."  Doc. 43-4, PageID 937.  Accordingly, the sole issue is whether the City's conditioning of the grant of the needed residential leasing permit to Class Members on their prior payment of The Fee is justified by the foregoing avowed interests.

## II.  LAW AND ANALYSIS

The City exacts from those homeowners who are nonresidents of Cuyahoga County ("Class Members") $100 per year, per residence, in exchange for the requite land use permit that allows them to lease their residential homes to others.  It then immediately transfers Class Members private funds to its general revenue fund and spends on those funds on whatever public use it prefers.  Costs inflicted by Class Members' leasing are completely untracked, how their funds are spent is similarly untracked, and the use of those funds is both undesignated and unrestricted by the text of the City's Municipal Code.   No proffered or

deducible justification for levying The Fee on Class Members withstands *any* scrutiny, much less *Nollan/Dolan* scrutiny.

**A.  Neither acquisition of contract information from Class Members nor notification and "Service of Process," costs justify imposition of the Fee on Class Members.**

The City now lauds the Fee as "ensuring that the City has a local agent who can receive service of process and violation notices."  Doc. 48, PageID 1124.  However, the City's discrimination against Class Members, through levying the Outsiders Penalty on them alone, cannot be justified by the City's need to acquire contact information from them.

Rather, Class Members are *identically* situated to residential landlords residing within Cuyahoga County insofar as (1) all homeowners' (including landlords') legally binding mailing addresses are on file with the Cuyahoga County auditor; and (2) Class Members have already provided both their contact information and a local agents' contact information to the City when acquiring the standard Certificate of Occupancy required of residential landlords both within and beyond Cuyahoga County.  Consequently, imposing any additional financial burden on the basis of residency alone, for the purposes of acquiring contact information from Class Members, is arbitrary *as a matter of law.*

Likewise, the City's discrimination against Class Members, through levying the Outsiders Penalty on them alone, cannot be justified by the City's need to offset unusually high costs induced by sending correspondence (service of process and notifications) to Class Members.  This is because Class Members are identically situated to residential landlords residing within Cuyahoga County with respect to the cost of correspondence (email and phone calls are the same cost (free), regular mail is the same cost, and certified mail with a return receipt is the same cost anywhere in the United States),[1] and there is no evidence of a significantly greater volume of such correspondence directed towards Class Members.  Consequently,

---

[1]      See https://www.certifiedmaillabels.com/usps-postal-rates ("*New USPS Certified Mail Rates begin January 19, 2025*:  The postage meter rate to send a 1-ounce USPS Certified Mail letter with a Return Receipt (old-fashioned Green Card) will cost $9.64 at the Post Office. If you use online services from Certified Mail Labels with Electronic Delivery Confirmation, the cost can be reduced to $6.49. Additional options such as Return Receipt Electronic Signatures cost $2.62. First Class postage stamps will cost $0.73 at the Post Office.").   See also United States Post Office website, at https://www.usps.com/ship/insurance-extra-services.htm.  Last checked January 1, 2025.

imposing any additional financial burden on the basis of residency alone, for the purposes offsetting hypothetically atypical costs induced by transmitting correspondence to Class Members, is also arbitrary *as a matter of law*.

### i. Levying the Outsiders Penalty advances no interest in acquiring jurisdiction over Class Members.

As a threshold matter, the City needs no fee or local agent to maintain *jurisdiction* over nonresident homeowners because it already maintains jurisdiction over Class Members by virtue of its jurisdiction over their homes located within the City of Cleveland Heights. *Lorain Cty. Treasurer v. Schultz*, 2009-Ohio-1828, ¶ 10 ("an in rem proceeding . . . operates on the land itself and not on the title of the one in whose name the property is listed for taxation"); see also *In re Foreclosure of Lien for Delinquent Taxes by Action in Rem,* 2008–Ohio–1173, 7th Dist. No. 06–JE–40, at ¶ 18, quoting *Hunter v. Grier* (1962), 173 Ohio St. 158, 161.  The Supreme Court has long affirmed the same.  *Shaffer v. Heitner*, 433 U.S. 186, 207–08, 97 S. Ct. 2569, 2581–82 (1977)("the presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation. For example, when claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant, it would be unusual for the State where the property is located not to have jurisdiction . . . The presence of property may also favor jurisdiction in cases such as suits for injury suffered on the land of an absentee owner, where the defendant's ownership of the property is conceded but the cause of action is otherwise related to rights and duties growing out of that ownership").

Because the City claims concerns exclusively related to mitigating negative externalities of homes leased by nonresident homeowners, local courts maintain jurisdiction to remedy those externalities without the need for additional assistance from the City's Municipal Code.

### ii. Levying The Fee advances no interest in acquiring information necessary to serve nonresident homeowners with legal notices.

In the absence of the Outsiders Penalty, the City already maintains the information necessary to contact and serve process on any Cleveland Heights homeowner, irrespective of that homeowner's location.

*First*, a Cleveland Heights homeowner *already* maintains a "statutory obligation to inform the Treasurer of his current mailing address for taxation, as well as the more basic responsibility to maintain a method for receipt of mail related to his property." *Lorain Cty. Treasurer v. Schultz*, 2009-Ohio-1828, ¶¶ 11-12, citing R.C. 323.13.  And to that address, "certified mail and publication" suffice even pursuant to such drastic steps as governmental foreclosure on that property.  *Id.,* at ¶11.

"Service [] to an owner's tax mailing address ordinarily will satisfy that standard, because the owner designates that address to the auditor at the time of transfer (R.C. 319.20) and has a duty to notify the county treasurer of any changes (R.C. 323.13)." *Groveport Madison Loc. Sch. Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 2017-Ohio-1428, ¶ 17, 149 Ohio St. 3d 706, 710 (parenthetical citations to Revised Code in the original); *See also Disciplinary Counsel v. Taylor,* 120 Ohio St.3d 366, 2008-Ohio-6202, ¶ 13 (stating that the tax mailing address associated with a parcel of real property "serve[s] to furnish county officials and the public with the designated address at which the property owner or the owner's agent would receive notice of tax assessments and other related filings"); *In re Foreclosure of Liens for Delinquent Taxes,* 62 Ohio St.2d 333, 337–338, 405 ("In situations where a taxpayer supplies officials with an address, it may be fairly presumed that the taxpayer can be reached at such address"); *J. Terry Evans Licking County Treasurer v. Jallaq* (Ohio App. 5 Dist., Licking, 08-22-1996) No. 95CA-127, 1996 WL 488427(the county treasurer need only look to the county tax records for the property owner's last listed address for service by publication . . . to constitute sufficient service of process upon the property owner).  This approach "exceeds the minimum due process requirements." *Schultz*, ¶ 11.

The City fails to explain why its plenary access to the records of the Cuyahoga County Auditor, available to all, is insufficient to provide information to serve any legal or other document on homeowners. See R.C. 319.20 ("The address of the grantee, or any one of the grantees, set forth in the deed or other evidences of title shall be entered by the auditor on the transfer sheets and on the general tax list of real property prepared pursuant to section 319.28 of the Revised Code") and R.C. 319.28 ("containing the names of the several persons, companies, firms, partnerships, associations, and corporations in whose names real

property has been listed in each township, municipal corporation, special district, or separate school district, or part of either in the auditor's county").

Notably, given the City's proclamation that it costs $100 per property per year to collect these already-available contact information, the County charges nothing to collect it. R.C. 323.13. And interestingly, the County only collects this information *once*, rather than annually, with the caveat that the homeowner is to update it if that contact information changes. Thus, as a matter of law, forcing nonresident homeowners to pay, repeatedly every year, $100 per residence to designate a local agent for "service of process" or even other notifications is arbitrary.

This is especially true *in Cleveland Heights*, where the City already compels the same contact information, alongside a $200 processing/registration fee, from Class Members, to obtain a basic certificate of occupancy to lease their residential homes. See Doc. 43-2, PageID 889-890, 892 (All homeowners obtain this rental registration permit, or "certificate of occupancy," by "annually supplying necessary information . . . such information shall include . . . the name, address, telephone number, and email address of the agent or person in charge of the property," and "if the owner does not reside on the premises, the name, address, telephone number, and email address of the resident agent in charge of the building or structure," as well "the nonresident agent," if any), citing 1347.03, 1347.03(b)(2), 1347.06(a).

### iii. Levying The Fee advances no interest in acquiring information necessary to serve nonresident homeowners with legal notices *even when those homeowners assume the corporate form*.

As a matter of law, the fact that *some* Class Members (just like local landlords) own homes in the name of their business entity rather than individually (See Doc. 24-3) alters no part of the analysis above: the address where the home's property tax bill goes is readily available, and suffices for serving legal notices and filings on that business, over whom local courts maintain jurisdiction by virtue of the property located within the City.

In addition, service of process on a corporation is controlled by Civ.R. 4.2(F). "In Ohio, service on a corporation may be made in several ways: by serving the corporation's statutory agent, by serving the corporation at any of its usual places of business, or by serving an officer, managing agent, or general agent

of the corporation." *Youngstown City Demolition v. Rainy Day Rentals, Inc.,* 2023-Ohio-3601, ¶ 13. "Where a notice is sent by registered mail, with a return receipt requested, and thereafter a signed receipt is returned, a prima facie case is established of the fact of delivery of such notice to such address." *Id.,* ¶ 14. With respect to certified mail, "[s]o long as the postal receipt is signed and returned, service is effective 'even if not delivered to the defendant or to a person authorized by appointment or by law to receive service of process for defendant.'" *Id.,* citing *Samson Sales, Inc. v. Honeywell, Inc.*, 66 Ohio St.2d 290, 293 (1981). At any "usual place of business" suffices: "the presumption of proper service arises when a plaintiff makes service to a corporate location reasonably calculated to apprise the corporation of the pendency of the action, and when the Postal Service returns a receipt signed by any person from that location." *Youngstown,* at ¶ 16, citing Civ.R. 4.2(F) (governing service on corporations); Civ.R. 4.2(H) (governing service on partnerships). Alongside the property tax address on file with the Cuyahoga County auditory, the Ohio or nonresident business entity leasing a home within the City of Cleveland Heights may be served at any commercial address it owns. *Youngstown,* at ¶ 18-20. And of course, Ohio corporations and partnerships maintain a statutory agent whose address is on file with the Ohio Secretary of State – and service may also be mailed to this address.

None of the forgoing entails extra costs or complications beyond the costs or complications associated with serving or otherwise notifying nonresident homeowners residing *within* Cuyahoga County. And given the availability of property tax addresses, the conventional concern - that serving foreign corporate defendants may be more arduous than serving domestic entities - is inapplicable here.

### iv. Levying The Fee to underwrite "designation of a local agent who can receive service of process" is unjustifiable because service of process on local agents does not serve *individual* Class Members.

As can be readily observed, many Class Members are individuals rather than business entities. Doc. 24-3. The Court of Appeals for the Eight District recently observed the following: "[u]nlike its federal counterpart, Civ. R. 4.2(A) does not include express authorization for service of process on an individual to be made through that individual's agent." *Continuum Transportation Servs., Ltd. v. Elite Int'l Corp., LLC,*

2024-Ohio-340, ¶ 14.  Consequently, imposing a $100 annual exaction on each property owned by an individual does not serve any governmental interest in underwriting service of process costs on a local agent of that individual:  such service is unlawful.  This justification thus fails as a matter of law.

Meanwhile, individuals are easily served through mailing the address they have provided pursuant to R.C. 323.13 and R.C. 323.19.  And just as with business entities, there are many additional routine and inexpensive means of serving individuals, all the same whether within Cuyahoga County, beyond the county within Ohio, or beyond Ohio.  See *Continuum Transportation,* supra, at ¶ 19.

**v. Levying The Fee advances no interest in acquiring information necessary to serve or contact nonresident *Ohio* Class Members or non-Ohio Class Members.**

The City fails to even attempt to explain why those residing outside of Cuyahoga County are more difficult to mail, email, or call on the telephone.  This Court may take judicial notice of the realities that (1) email is free; (2) gone are the days of long-distance phone charges (3) one postage stamp will transmit one letter anywhere in the nation; and (4) the cost of sending a letter via United States Post Office Certified Mail with a Return Receipt is the same (and less than $10) irrespective of to where in the United States it is mailed.  When serving a homeowner residing in western Cuyahoga County who does not pay the Fee, the foregoing costs are no different.  Thus, *as a matter of law*, there is no basis for distinguishing homeowners within from homeowners beyond Cuyahoga County for the purpose acquiring their contract information or defraying the costs of services of process.

While there may be some intuitive concern that out-of-state homeowners are more difficult to locate and serve than those within Ohio, this mere intuition is counteracted by the reality that those out-of-state homeowners' addresses are immediately available to the City through Cuyahoga County's property tax information identified above.  So as a *matter of law*, this intuition is not a conceivable basis for distinguishing, with respect to mitigating externalities arising from notification and service of process costs, between those homeowners residing within and those residing beyond Cuyahoga County.

To the extent that the City wants a phone number or email address instead of a mailing address, this desire cannot justify imposing The Fee:  (1) those methods are neither necessary nor viable means of

effectuating the City's avowed government interest of serving legal summons; and (2) the City already has that contact information prior to imposing the Outsiders Penalty by virtue of having, beforehand, imposed Cleveland Heights Municipal Code Section 1347.02 and its attendant fees on each and every Class Member here.

At bottom, then, the City's naked assertion that it deserves to prevail here because municipalities in other states prevailed in their dissimilar cases fails: *out of state cases* have no import because it is not clear whether other states gift-wrap the addresses of nonresident owners of local homes in the same way that R.C. 323 *et seq.* require in Ohio (no cases discuss this dispositive state of the law).  Nor are *cases from other cities* relevant because there is no indication that any other city already requires disclosure of all information necessary to contact the nonresident homeowner *and his, her or its agent*, and charges a hefty fee for *that*, *before* then *again* requiring the same contact information and *charging the homeowner again* for it.

Requiring Class Members to pay *yet again* to supply *the same* information for a *third time* is discriminatory and extortionate, rather than a permissible effectuation of any governmental interest, including mitigation of any externality (imagined or real), that Class Members alone have imposed. *Rinaldi v. Yeager*, 384 U.S. 305, 307–11 (1966)("the law fastens the duty of repayment only upon a single class of unsuccessful appellants—those who are confined in institutions. We find that the discriminatory classification imposed by this law violates the requirements of the Equal Protection Clause"); *Bannum, Inc. v. City of Louisville* (6th Cir. 1992) 958 F.3d 1354, at 1355-61(ordinance requiring special-use permits for housing "meant to facilitate the reintegration of federal offenders into society" violated equal protection because city's public-safety justification "so attenuated as to render the distinction arbitrary or irrational"); *City of Richmond Heights v. LoConti,* 19 Ohio App. 2d 100, 101–16 (1969)("unconstitutional as a licensing ordinance because it is wholly out of proportion to any burden imposed upon the municipality by the licensed activity, and because it discriminates against one form of activity which bears no greater relation to the evils sought to be prohibited than do other activities which are not licensed")

9

None of the foregoing turns on *factual* disputes to which any deference is owed to the City.  The law regarding service of process alone in sufficient to negate any proposed justification of the Outsiders Penalty as necessary or helpful to underwrite service of legal documents on Class Members.

In summary, each rationale the City relies upon requires adoption of a *legal* fiction:  the fiction that the Class Members contact information is not readily available, twice over, as a matter of law, and the fiction the costs of each correspondence with Class Members is greater than that of corresponding with residents of Cuyahoga County.  This is quintessentially arbitrary and impermissible.

**vi.  Levying The Fee cannot be justified by animus or protectionism.**

The reason for City's avowed need to acquire contact information for, and then notify nonresident homeowners of problems related to their home is, according to the City, to "positively impact the quality of the City's housing stock."  Doc. 43-4, PageID 937.  But there is no evidence, or even a reason to believe, that Class Members impose unique harm on "the City's housing stock."  The closest attempt in this direction is a social justice housing policy manifesto penned long after the City first began imposing the Outsiders Penalty - - which the City attaches to support its views.  Doc. 43-8.  Therein, the authors rage, without data, against capitalism, regarding *all* "investors" as miscreants who "don't invest in anything" and just "extract every dime out of those houses and walk away when they require demolition," PageID 983.  And they demand tactics that "further policy preferences for homeownership" and "access to affordable housing," "correct the imbalances of bargaining power between landlords and tenants," and "repair this region's broken housing market."  PageID 989, 991; Doc. 43-8 PageID 988, 991-92, 1015 ("several different archetypes or profiles of investor have been shown to be problematic and prevalent in the region," including "the nonlocal investor owner protected from accountability for property conditions by multiple shells of limited liability and supported by ostensibly local property managers similarly protected by limited liability structures . . . who only serve their own interests," and "our recommendation are aimed at investors engaged in practices that undermine community value, health, and stability").  Those "investors buying residential real estate threaten to undermine housing conditions, market stability, and housing value," the City tells us.  Id., at PageID 989.

The City's "evidence" thus reads like an Upton Sinclar or John Steinbach dramatization.  Not summary judgment evidence.  However, the "bare desire to harm a politically unpopular group" is not considered a legitimate state interest. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447, (1985) (quoting *United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 535 (1973)(finding that a city's requirement that a home for the mentally disabled obtain a special use permit, unlike other similarly situated buildings, was unconstitutional).  And "mere negative attitudes, or fear ... are not permissible bases" for differential treatment.  *Cleburne*, at 449.  The Sixth Circuit later relegated "protectionism" to the same impermissible camp, pursuant to mere "heightened rational basis review" or "rational basis with teeth."

As such, to the extent that the foregoing reflects the full range of rationales relied upon by the City, no further analysis is needed:  the imposition of The Fee violates Class Members' rights to Equal Protection and Due Process, as well as their Privileges and Immunities.  Accordingly, The Fee must be enjoined, and funds collected pursuant thereto must be returned to Class Members.

**B.  The City fails to meet its burden to demonstrate an essential nexus and rough proportionality between the condition that the Fee be paid and either offsetting unusual costs of correspondence with Class Members or offsetting unusual costs imposed by the condition of Class Members' homes.**

With costs of acquiring contact information from and corresponding with Class Members ruled out above, the issue is whittled down to whether The Fee could be justified on the basis of offsetting (1) costs arising from hypothetically greater *volume* of the foregoing types of communications with Class Members; or (2) costs arising from hypothetical housing problems maintained by Outsiders that would be *the underlying subject matter of those communications.*

Put otherwise, offering a residential lease while residing in any other county must force the City to incur additional correspondence and/or nuisance abatement work, *and* The Fee must do nothing more than require Class Members to bear the proportionate amount of that cost.  Doc. 48, PageID 1124-26 (City claiming The Fee is justified by "reducing public nuisances," and "offsetting the costs" of "regulating that business" and "advancing the public safety and welfare").

11

i. **Levying The Fee to offset unusual costs of correspondence with Class Members or to offset unusual costs imposed by the condition of Class Members' homes must withstand *Nollan/Dolan* scrutiny.**

As a threshold matter, the City claims that The Fee is not subject to the heightened scrutiny required by the Unconstitutional Conditions Doctrine for many reasons.  To be sure, Plaintiffs present a claim within a rapidly-developing field.  But the City's defenses are more novel yet, and even more rapidly-developing, given its shotgun approach and abandonment of its initial defenses revolving around "adjudicative land-use exactions," and "so-called 'in lieu of' fees," Doc. 15, PageID 208-09.  However, the new terrain to which the City has retreated provides no refuge.

a. **Combining The Fee with a regulatory mandate does not immunize it from *Nollan/Dolan* scrutiny.**

Initially, the City claims that its Outsiders Penalty is permissible because, in exacting in, the City is *merely engaging in "regulation"* and "use restrictions" to reign in "unbridled" property rights.  Doc. 48, PageID 1117, 1123-25 (The Fee "does not violate the unconstitutional conditions doctrine because [] it is well established that municipalities have the power to directly regulate the renting and leasing of dwellings").

*First*, the only "regulation" linked to The Fee is the mandated disclosure of the same contact information for the third time.  As discussed above, this is a Potemkin pretext for extracting The Fee, rather than a justification for doing so.

*Second,* extracting permit fees within a larger context related to residential leasing has never been interpreted as prohibiting application of *Nollan/Dolan*.  See *Levin v. City & Cnty. of San Francisco*, 71 F. Supp. 3d 1072, 1085–86 (N.D. Cal. 2014)("The payout comes with no restrictions on how it is spent, no ability to ensure that the money be spent on housing or in San Francisco at all, and is not limited to low-income tenants whom the payout might persuade to stay in San Francisco—all factors that weigh against the City's ability to prove that the exaction 'further[s] the end advanced as the justification' for the Ordinance, in satisfaction of the essential nexus test"); *Ballinger v. City of Oakland,* 24 F.4th 1287, 1299 (9th Cir. 2022)("The Supreme Court has suggested that any government action, including administrative and legislative, that conditionally grants a benefit, such as a permit, can supply the basis for an exaction claim

rather than a basic takings claim") *Com. Builders of N. Cal.*, 941 F.2d at 873 (applying exactions analysis to legislative ordinance imposing a fee to finance low-income housing in connection with the issuance of permits for nonresidential development).

*Third, Koontz* alone controls the "predicate taking" *Koontz*, at 612; see also *Am. Furniture Warehouse Co. v. Town of Gilbert*, 245 Ariz. 156, 163 (Ct. App. 2018)("*Koontz* held that, when applicable, *Nollan/Dolan* provides the proper analysis when the government conditions issuance of a permit either upon the payment of a fee or upon the transfer of property").  And "[w]hether the demand for money is an "exaction" subject to *Nollan/Dolan* is controlled by *Koontz*, which answers in the affirmative: "We hold that the government's demand for property from a land-use permit applicant must satisfy the requirements of *Nollan* and *Dolan* . . . even when its demand is for money."  *Koontz*, at 619.[2]  The *Koontz* Court reasoned that a monetary exaction meets that requirement because it involves a <u>"demand for money" that "'operate[s] upon . . . an identified property interest' by directing the owner of a particular piece of property to make a monetary payment</u>." *Id*.  In this way, a monetary exaction is dissimilar to a general financial obligation because it is inextricably linked to and "burden[s] . . . ownership of a specific parcel of land." *Id*.  That, the Court concluded, is an "impermissibl[e] burden" on a property owners' rights, *Id*., at 608, and therefore establishes the "predicate taking" in monetary exactions cases.  *Id*., at 619.

Like the money demand in *Koontz*, The Fee acts upon each specific parcel owned by Class Members, preempting a fundamental use until money is paid to the City for the land use permit.  See Doc. 43-7, PageID 965 (City confirming Class Members leasing is prohibited without primary payment of The Fee).

---

[2]     The Court found the answer to that question in Justice Kennedy's opinion in *Eastern Enterprises v. Apfel* (1998), where he explained that a regulation that allocates a public financial burden onto a private party will be a taking if it "operate[s] upon or alter[s] an identified property interest." *Koontz*, at 613 (quoting *E. Enterprises*, 524 U.S. 498, 540 (conc. & dis. opn. of Kennedy, J.)).)

b.      **Whether the label "impact fee" is employed is not dispositive regarding whether *Nollan/Dolan* scrutiny applies.**

The City insists that heightened scrutiny is *limited to "impact fees."* Doc. 48, PageID 1118, 1120, 1122-23.  *First*, the City's confusion likely arises from the happenstance that *Nollan*, *Dolan*, and *Sheetz* all originated in California, where "impact fee" is a term of art defined by statute.  Not so in Ohio, where courts are left to distinguish exactions from user fees and taxes.

*Second*, to suggest that the *Koontz* opinion is *impliedly* limited to that single subtype of permit fee would transgress the axiom that the U.S. Supreme Court does not rule by implication.  *Agostini v. Felton*, 521 U.S. 203, 237 (1997).

*Third*, courts have applied *Nollan* scrutiny in numerous instances where the demand for money was not called an "impact fee."  See, *inter alia*, *Anderson Creek Partners, L.P. v. County of Harnett*, 382 N.C. 1, 40 (2022) (hookup fees earmarked to fund the expansion of sewer and water infrastructure held subject to Nollan/Dolan); *F.P. Dev., LLC v. Charter Twp. of Canton* 16 F.4th 198, 207–208 (6th Cir. 2021)(tree loss mitigation fee held subject to *Nollan/Dolan*); *Knight v. Metro. Gov't of Nashville & Davidson Cnty.*, 67 F.4th 816, 826 (6th Cir. 2023) (sidewalk fee subject to Nollan/Dolan); *Charter Twp. of Canton v. 44650, Inc.* (Mich.Ct.App. Apr.13, 2023) 2023 WL 2938991, at 12–13 (invalidating tree loss mitigation fee held subject to *Nollan/Dolan*); *Levin v. City & Cnty. of San Francisco*, 71 F.Supp.3d 1072, 1081–82 (N.D. Cal. 2014) (invalidating tenant relocation fee under *Nollan/Dolan*).

Most recently, a post-*Sheetz* court invalidated under *Nollan* scrutiny, analogously to here, a "$100 payments of non-refundable contributions, if and when they seek conversion [of a use from 'live-work' to residential]" as a "precondition to filing for or issuing any building permit allowing the conversion.  *Coal. for Fairness in Soho & Noho, Inc. v. City of New York*, No. 151255/22, 2024 WL 4982226, at 1 (N.Y. App. Div. Dec. 5, 2024)("The Arts Fund fee constitutes a permit condition for which the 'two-part test modeled on the unconstitutional conditions doctrine' applies").

Moreover, The Fee is at least the functional equivalent of a "fee" levied on an "impact": the City (1) in exchange for a permit to engage in use that the City claims has a negative impact; (2) insists on money related to an identifiable property; and (3) which it claims is to mitigate that impact.

### c.  The Fee is not a "user fee."

The City also now claims The Fee is exempt as a "*user fee*." Doc. 48, PageID 1118-20. However, The Fee is not a permissible user fee because (1) the fee is placed in the City's general fund, and its use is therefore legally unrestricted, pursuant to the City's own acknowledgment, and the City acknowledged that the fees are not separately used to pay for any specific expenses in relation to out-of-county owners, (2) the fee payers are not receiving or consuming any additional service in exchange for its fees, only the services that their taxes already pay for; (3) the City acknowledges that there is no accounting for these fees being used for a specific charge of services to the paying out-of-county owners; (4) no text of any municipal ordinance identifies any enforceable rights, entitlements, or duties that arise in response to Plaintiffs' payment of the Outsiders Penalty; and (5) because it is unbound by the text of any municipal ordinance governing distribution of the Outsiders Penalty's revenues the City is free to spend revenue collected through levying the Outsiders Penalty however it likes. See *White v. Cincinnati,* 2021-Ohio-4003, ¶¶ 29-31, 38 *appeal not allowed,* 2022-Ohio-743, ¶¶ 25-46, 166 Ohio St. 3d 1428 (not a "user fee" because "nothing in Chapter 807 states that revenue from the assessments must be spent on costs related to alarm systems and false alarms. Thus, the funds can be spent in a general way on normal expenditures of government," and "[a]lthough the city contends that the revenue from the assessments is to defray some of the costs from false alarms, the fact that it is put in the general fund and could be used for any expenditure cannot be ignored"); *AE Owner, LLC v. Cleveland*, 8th Dist. Cuyahoga No. 107475, 2019-Ohio-2220, 2019 WL 2395918, ¶ 9, 13 (Not a permissible "user fee" when the financial burden on the homeowner is detached from "the burden imposed by the activity being licensed," and "[t]he collected funds were placed in East Cleveland's general fund and were used on any needed expenditure rather than allocated for limited or narrow purposes. The city's general fund, which supports city operations as a whole, provided fire, police, EMS, and service

department amenities to all residents"); *Drees Co. v. Hamilton Twp.*, 2012-Ohio-2370, ¶¶ 21-22 ("Rejecting characterization of an assessment as a user fee because there is *no requirement* that money placed into the police fund goes to create a police substation near a new neighborhood").

Likewise, a municipal assessment is not a permissible user fee when it is not "imposed by a government in return for a service it provides." *White*, ¶¶ 29-31 ("There are no services provided directly to the payers of the assessments that are not provided to all city residents . . . Chapter 807 does not obligate the city to respond to alarms in any specific way, it does not entitle alarm businesses and alarm users to any particular response from the city, or empower alarm businesses or users to enforce a right to any specific response from the city. There are no separate or additional services provided to those paying the fees. All taxpayers in the city are entitled to police protection . . . there is no provision in Chapter 807 providing that if the revenue from the amount of fees exceeds the costs, the excess must be used for purposes related to false alarms . . ."); see also ¶40 ("[R]esidents or non-residents are not receiving a service for the payment of the registration fee . . . the City's alarm registration fee is based solely on status instead of the use of any city service"); *Folio v. City of Clarksburg, W.Va.*, 134 F.3d 1211, 1217 (4th Cir. 1998)("fee based upon a resident's property owner status *instead of his use of the city service*," not a valid "user fee").

Simply put, when tied to a land-use permit for a specific parcel, "[courts] treat[] confiscations of money as takings despite their functional similarity to a tax." *Koontz,* at 615 ("where the government, by confiscating financial obligations, achieved a result that *could* have been obtained by imposing a tax").

### d. There is no impermissible "slippery slope" in scrutinizing The Fee through *Nollan/Dolan* scrutiny.

The City claims that if its OP were even *analyzed* pursuant to the Unconstitutional Conditions Doctrine (which, in the abstract, guarantees no particular result), then "*any fee* as a condition for leasing property to third parties" must withstand such scrutiny. Doc. 48, PageID 1117.

*First,* heightened scrutiny when housing permit conditions require payment of money have stood alongside a myriad of regulations and fees at least since the Ohio Supreme Court's *Beavercreek* decision 25 years ago, without the sky falling. *Koontz*, supra., at 595–636, relying, in part, on *Home Builders Assn. v.*

*Beavercreek,* 89 Ohio St.3d 121, 128 (2000), for the proposition that "[n]umerous courts—including courts in many of our Nation's most populous States—have confronted constitutional challenges to monetary exactions over the last two decades and applied the standard from *Nollan* and *Dolan* or something like it.").

*Second*, the City is functionally urging this Court to follow *the dissent* from *Koontz. Koontz*'s unqualified holding prompted Justice Kagan, writing in dissent, to observe that the majority opinion had extended *Nollan/Dolan* to apply "to permit conditions requiring monetary payments— with no express limitation except as to taxes." *Id*. at 626 (dis. opn. of Kagan, J.); 629 (acknowledging that the majority opinion holds "all monetary exactions" subject to *Nollan/Dolan*).  Thus, all the Justices in *Koontz* agreed as to the holding of the case.  And, in *Sheetz*, seven Justices did not dispute that *Koontz* confirmed that the fee there was an exaction subject to *Nollan/Dolan*.

### ii.  There is no evidence of an "essential nexus" or "rough proportionality" between The Fee and the costs of negative externalities imposed by Class Members.

*First*, the City must demonstrate with the evidence that the effect of The Fee is not to coerce Class Members into paying for broad public problems that are not attributable their use of their homes.  *Koontz*, 604–05; *Commercial Builders of Northern California v. City of Sacramento* 941 F.2d 872, 874 (9th Cir. 1991) ("an exaction on developers can be upheld only if it can be shown that the development in question is directly responsible for the social ill that the exaction is designed to alleviate"); *Levin, supra.* (the city "seeks to force the property owner to pay for a broad public problem not of the owner's making").

The Fee fails the nexus test because (1) the City does not tack whether or to what extent Class Members' residential leasing creates externalities at all; (2) through marshalling Class Members payments through the general fund and then spending them without restriction, or tracking, it spends them on *all public problems,* indifferently; and (3) the City *endorses* spending the funds on all manner of purely broad public social justice, housing equity and affordability, and protectionist projects unrelated to Class Members. Doc. 43, PageID 958 ("The ordinance requiring the registration of dwelling structures by out-of-county owners (CHCO Section 1351.34) does not require the City to maintain an itemized list of what the fees are being

spent on, and therefore such a list does not exist"); Doc. 45-1, PageID 1039-47 (in justifying The Fee, the City makes vague allusions to countering "a general feeling of poor maintenance and neglect," "loss of historic architectural integrity," and "quality of life issues"); Doc. 48, PageID 1130, citing Doc. 43-8, PageID 987-88, 991, 994 (lamenting "racial and socioeconomic inequities," and "the fundamental nature of our economic and political relationships," that the housing market is "no longer controlled by local actors," "skyrocketing sales prices and rents," that "out of town investors push values up on the low end by increasing demand," and that "permits are ignored in predominantly African-American or other minority neighborhoods" causing a "disparate negative impact." And they demand tactics that "further policy preferences for homeownership" and "access to affordable housing," "correct the imbalances of bargaining power between landlords and tenants," and "repair this region's broken housing market." Id., PageID 989, 991.

However, to meet the *Nollan* standard, the government cannot rely on hyperbole or generalized conclusions regarding the impacts or mitigation of them. *Dolan*, 512 U.S. at 391, 389 ("generalized statements" about the required connection are "too lax to adequately protect" constitutional rights). One very recent post-*Sheetz* application of a monetary exaction for public projects in exchange for a change of use permit explained this: "the City's asserted goal of supporting art and local artists, is not related to any land use interest . . . Instead, money from the Arts Fund "shall be allocated ... to support arts programming, projects, organizations, and facilities that promote the public presence of the arts within the District and surrounding neighborhoods," with priority given to "under-resourced organizations and under-served areas" *Coal. for Fairness in Soho* at 1. While the City's list of grievances to be remediated are at least loosely related to housing, some are quite far afield, dealing with economic and social engineering. And allocation of The Fee to the general fund, where it is tracked no further and can be spend on public arts projects and city employees' holiday parties, negates the possibility of a nexus. Accordingly, the City fails *Nollan's* nexus requirement. And on this basis alone, The Fee must be enjoined and amounts collected must be returned to Class Members.

18

*Second,* even if a sufficient nexus could be shown, the City still fails to establish rough proportionality between The Fee and the costs it claims it is offsetting:  the City has not proven that the repeated and redundant $100 annual impact fees here are proportional to any negative impacts attributable to residential leasing undertaken by Class Members. The Fee fails the proportionality test because the City undertook no analysis whatsoever to calibrate its amount so as to collect money in an amount commensurate with any cost actually imposed by Class Members.  *Sheetz,* at 276.

However, the "individualized determination" requirement focuses on whether the government can show a sufficient connection between the fee and the impact of "the proposed development." *Id*. That is the only way to ensure that an appropriation of money from a particular landowner is for mitigation versus an uncompensated taking.  *Sheetz,* at p. 276 ("A permit condition that requires a landowner to give up more than is necessary to mitigate harms resulting from new development has the same potential for abuse as a condition that is unrelated to that purpose"); *Coal. for Fairness in Soho* at 2 ("The City also fails to demonstrate rough proportionality, since there is no evidence of negative impacts on certified artists arising from the changes in zoning"), citing *Sheetz,* at 275–276, *Dolan,* at 2309.

Here, the City does not know, and so provides no evidence as to whether, Class Members create more or less externalities than Cuyahoga County residents, or to what extent they create negative externalities at all – it fails to provide even a single example.[3]  Indeed, the City concedes it performed no

---

[3]        City Housing Director Allen Butler was questioned "has your department been spending a lot more time and resources on out of county landlords' property maintenance code issues, versus the local landlords' property maintenance code issues?"  Doc. 24-1, PageID 460.  He responded "we don't track those costs individually . . . we don't keep track of those issues specifically, so I cant' really answer that."  *Id.*  Butler was further questioned "Do you know whether or not a majority of your resources are dedicated towards landlords that live out of county, or do you not track that when you are doing that work?"  Butler again responded "we don't track the resources that we use for, specifically for that purpose . . . those aren't tracked individually." *Id*.; see also Doc. 24-2, PageID 467 ("*The City does not keep track* or maintain records or information that would" identify "all unique services, benefits, privileges, and /or opportunities provided by the City to [Class Members], or "all costs to the City, in dollars, of [Class Members' conduct]," including service-related issues); Doc. 24-2, PageID 469 (City concedes it "does not keep any records that track the actual cost of processing out-of-county registration applications," or "any singular out-of-county registration application," nor does it "track any variable costs" or know any "factor that determines the variability of the aforesaid cost(s)"); Doc. 45-1, PageID 1034-1036 (when asked to identify those costs, the City indicates "the City does not keep track of the total amount of costs incurred by the City," much less "as a result of out of county property owners who fail to maintain the condition of local residential dwellings," nor can the City identify even one example of when such a cost was ever incurred, nor can the City confirm that costs imposed homeowners residing beyond Cuyahoga Couty exceed costs imposed by homeowners who lease

analysis, individualized or otherwise, or regarding calibration of the amount or otherwise, prior to electing to impose The Fee at the current rate.  *Id.,* at 1048-49.

And the fact that the City here confronts a "class of properties" neither negates the "individualized determination" requirement, nor makes it impossible to implement.  *Nollan/Dolan* requires, not perfect correlation, but an essential nexus and rough proportionality. Since "[n]o precise mathematical calculation is required," a particular homeowner's use could be grouped in with others who are similarly situated as to factors driving the externalities.  *Dolan*, at 391.

Accordingly, it is not difficult to envision how a roughly proportionate and calibrated approach to curing the hypothetical negative externalities the City expresses - similar to a manner in which the City already differentiates between homeowners when imposing special assessments.  Such an approach may consist of the following:  (1) studying, aggregating, and explaining costs imposed exclusively by Class Members' conduct; (2) assessing Class Members differently, if at all, on the basis of the externalities they have or are imposing, if any; and (3) implementing tiers of impact fees for non-resident homeowners based on factors like the number of Notices of Violations issued to the homeowner, the number of times legal summons have been served on the homeowner, past proven or outstanding fines, judgments, or tax delinquencies. To meet this constitutional standard, the government cannot rely on generalized conclusions regarding the impacts or mitigation of them. *Dolan*, at 391, 389 ("generalized statements" about the required connection are "too lax to adequately protect" constitutional rights).  Concomitantly, the City would need to justify why only nonresident homeowners are assessed for these externalities, which are presumably not limited to nonresidents alone.

Here, however, the City has never tabulated or tracked the costs of externalities it seeks to remediate, never segregated these funds for the purpose of doing so, and never differentiated between homeowners, other than the absolve Cuyahoga County landlords entirely, while shifting the burden to nonresidents as

---

while residing within Cuyahoga County . . . the City "does not separately track whether the owner of a dwelling unit that becomes the subject of a notice of violation resides inside Cuyahoga County").

though they are a homogenous class.  And as even the City concedes, "all investors cannot be lumped together – there are many good investors."  PageID 988.

Ultimately, the unconstitutional conditions doctrine asks whether the property owner is truly being made to internalize the externalities for which the property owner himself is responsible, or instead to bear burdens that should be borne by the general public.  *Armstrong v. United States*, 364 U.S. 40, 49 (1960). Without evidence of a nexus or proportionality, The Fee fails that test.

## III. CONCLUSION

In the instant, the City must be enjoined from relying upon The Fee as a basis for prosecuting, imposing fines upon or otherwise retaliating against Class Members.  Likewise, the City must now return impermissibly extracted fees.

Respectfully submitted,

*/s/ Maurice A. Thompson*
Maurice A. Thompson (0078548)
1851 Center for Constitutional Law
122 E. Main Street
Columbus, Ohio 43215
Tel: (614) 340-9817
*MThompson@OhioConstitution.org*

Michael R. Rasor (0086481)
Cavitch, Familo & Durkin
1300 East Ninth Street – 20th Floor
Cleveland, OH 44114
Tel:  (216) 472-4650
*MRasor@Cavitch.com*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all defendants through this Court's electronic filing system on the date of filing.

Respectfully submitted,

/s/ *Maurice A. Thompson*
Maurice A. Thompson (0078548)